# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 99-1163/99-1288

_____

| | | |
|---|---|---|
| GRACE BLACKMON, a minor, by and through her parent and next friend, W.D. Blackmon; W. D. BLACKMON; JULIE BLACKMON, | * * * * | |
| Appellees, | * * | |
| v. | * * * | Appeals from the United States District Court for the Western District of Missouri. |
| SPRINGFIELD R-XII SCHOOL DISTRICT, Springfield, MO, and its Board of Education | * * * * | |
| Appellant, | * * | |
| -------------------------------- | * * | |
| MISSOURI COUNCIL OF ADMINISTRATORS OF SPECIAL EDUCATION (MOCASE), | * * * * | |
| Amicus Curiae on Behalf, of Appellant, | * * * | |
| MISSOURI FAMILIES FOR EFFECTIVE AUTISM TREATMENT; ST. LOUIS LEARNING DISABILITIES ASSOCIATION, | * * * * * | |
| Amici Curiae on Behalf. of Appellees. | * * | |

Submitted: September 17, 1999
Filed:      December 2, 1999

Before McMILLIAN and MURPHY, Circuit Judges, and TUNHEIM,[1] District Judge.

TUNHEIM, District Judge.

Grace Blackmon ("Grace") brought claims against the School District of Springfield, R-12 (the "School District") under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* (the "IDEA"),[2] alleging that the individual education program ("IEP") offered to her by the School District was not reasonably calculated to provide her with a free, appropriate, public education. Grace's parents requested an impartial due process hearing for a determination of their claims pursuant to 20 U.S.C. § 1415(f). The administrative hearing panel determined that the IEP offered to Grace was appropriate, and further determined that the alternative IEP advocated by Grace's parents was inappropriate. The hearing panel also found that the School District committed no procedural violations in developing an IEP for Grace. Grace's parents appealed the hearing panel's decision to the United States District

---

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota, sitting by designation.

[2]Congress extensively revised the existing provisions of the IDEA in June 1997. *See* Individuals with Disabilities Education Act Amendments of 1997, Pub. L. No. 105-17, 111 Stat. 37 (1997). Most of the revisions took effect on June 4, 1997, before Grace and her parents filed their complaint, and a few of them became effective July 1, 1998, after Grace and her parents initiated this action but before the district court entered its decision. *See id.* § 201(a). The revisions do not appear materially to affect the issues raised on appeal.

Court for the Western District of Missouri. The district court reversed the hearing panel's determinations on December 4, 1998 and ordered the School District to reimburse Grace's parents for their expenses in educating her. By Order dated January 6, 1999, the district court further awarded attorney's fees to Grace and her parents. The School District appeals from both of the district court's orders. We reverse.

## I.

Grace is a minor child born July 12, 1993 who at all times relevant to these proceedings resided within the jurisdictional boundaries of the School District. Physicians have diagnosed Grace as suffering from a severe, diffuse, bilateral brain injury with hypotonic and autistic behaviors. The School District does not dispute that Grace is developmentally disabled and thus entitled to the protections and benefits of the IDEA.

When Grace was approximately fifteen months old, her parents enrolled her in a program designed to evaluate and treat her disabilities called the "First Steps" program. The "First Steps" program is operated by the Springfield Regional Center, a division of the Department of Mental Health, and is not in any way affiliated with the School District. Under this program Grace received speech and occupational therapy for four to five months, and received physical therapy for approximately ten months. Grace's parent's describe the program's approach as "traditional." Although Grace showed no significant improvement in fine motor skills based on the four to five months of occupational therapy she received, she made improvements in other areas, including significant progress in her gross motor skills.

Grace's parents were dissatisfied with her progress in the First Steps program and discontinued her enrollment on September 6, 1995. They thereafter enrolled her in an alternative program that they had been researching that is promoted by an organization called the Institutes for the Achievement of Human Potential (the

"Institutes"). The Institutes advocates an intensive, home-based training program requiring individualized therapy taught by a child's parents for twelve hours per day. The Institutes's program centers around the theory that stimulation of the brain, by repetitious activity and increased supplies of oxygen and carbon dioxide, will facilitate its growth. The Institutes's methodology is controversial and has been criticized in a number of medical journals.

In order to enroll Grace in the program her parents traveled with her to Philadelphia where the Institutes is located. The Institutes conducted an evaluation of Grace and provided her parents with a plan for her development. The program requires Grace's parents to keep detailed records of her daily activities, and to travel to Philadelphia for an assessment once every six months. Between visits, Grace's parents provide her with individualized therapy for twelve hours per day based on techniques they have learned through the Institutes's literature and through training provided to them during visits to Philadelphia. Grace's communication and gross motor skills have improved significantly during her treatment under the Institutes's program, and her parents are satisfied with her progress.

When Grace was three years old, and thus old enough to receive benefits under the IDEA, her parents contacted the School District and requested that it pay for the cost of training her under the Institutes's program. The School District informed them that it would need to evaluate Grace before making a determination regarding her education placement. The School District thereafter scheduled an evaluation for Grace and provided her parents with a copy of the procedural safeguards for parents and children set forth under the IDEA, as required by 20 U.S.C. § 1415(d). The School District put together a team of six employees who evaluated Grace and observed her on two separate occasions. The evaluation included standardized testing, observing Grace at school and in the home for several hours, a review of Grace's medical records and other documents provided to the school by Grace's parents, and interviews with Grace's parents. At the conclusion of the evaluation process, the School District

produced a twenty-five page "diagnostic summary" of Grace's health, skills and abilities. Although Grace's parents disagreed with parts of the diagnostic summary, and although they were aware of their statutory right to request an independent evaluation of Grace, *see* 20 U.S.C. § 1415(b)(1), they did not seek an independent evaluation or request that the School District otherwise reevaluate her.

After completing Grace's diagnostic summary, the School District held a conference with her parents to review the diagnostic summary and to develop an IEP for her. Grace's parents and five School District employees attended the conference, which was held on December 10, 1996. Prior to the meeting, the School District prepared a proposed IEP for Grace with sections pertaining to Grace's "present level of performance" and "goals and objectives" tentatively completed. At the meeting, the School District went through each of these sections item-by-item with Grace's parents and asked them whether they agreed with the proposed statements. Grace's parents in general indicated their agreement.

The School District then engaged in a discussion with Grace's parents about her appropriate placement. The School District indicated that it recommend Grace be placed in a "reverse mainstream" classroom[3] and that she additionally receive individualized speech, occupational and physical therapies. In addition to this option, the School District also discussed with Grace's parents the possibility that the School District would provide Grace with in-home individualized training, as well as the proposal that Grace's parents advocated, namely, that the School District reimburse them for Grace's in-home training through the Institutes. The School District nevertheless rejected these options because they would not provide Grace with the ability to interact with other children.

---

[3]A "reverse mainstream" classroom is one containing a majority of developmentally disabled children, and a minority of children with "normal" abilities.

When Grace's parents learned of the School District's recommendation they became upset and left the IEP meeting before a discussion of Grace's placement could be completed. In a letter to the School District dated December 25, 1996, Grace's parents revealed that they were upset because the School District did not recommend the Institutes's program, stating:

> [W]e thought the evaluators were simply going through the formalities before announcing that they thought our work with the Institutes was the ideal educational plan for Grace and we had their total support. . . . So, when the evaluators recommended the same program (we're pretty confident of this) for Grace they would have recommended before ever meeting us, we were totally outraged (and still are).

(Appellant's App., at 257.)

The School District provided Grace's parents with a written statement on December 11, 1996 confirming its decision to offer Grace education in a reverse mainstream classroom along with individualized speech, occupational and physical therapies. The School District further provided Grace's parents with another notice of the procedural safeguards under the IDEA. Subsequent efforts to resolve the differences between the School District and Grace's parents were unsuccessful. On December 20, 1996, the School District held an informal resolution conference with Grace's parents at its administrative offices that did not result in an agreement between the parties.

On January 3, 1997, Grace's parents exercised their rights under the IDEA to request an impartial due process hearing. In accord with Missouri state law, Mo. Rev. Stat. § 162.961, the hearing panel was comprised of three individuals with knowledge or training involving children with disabilities. Under the terms of the Missouri statute, the School District selected one member, Grace's parents selected another member, and the Missouri Department of Elementary and Secondary Education appointed an

–6–

attorney to serve as the chairperson. Separate counsel represented both the School District and Grace's parents at the hearing, and both parties submitted expert testimony and other evidence for the panel's consideration.

During the due process hearing, Grace's parents raised as issues for the hearing panel's consideration whether the School District's proposed IEP met the requirements of the IDEA, whether their alternative IEP met the requirements of the IDEA, the amount that the School District should be required to reimburse them for Grace's education, if any, and whether the School District should pay the attorney's fees that they had expended. Grace's parents did not challenge the School District's compliance with the IDEA's procedural requirements. Indeed, their attorney explicitly volunteered:

> I want to say to you gentlemen that the parents through their counsel has [sic] told the School District that they do not want this panel to decide this matter in favor of their child because of the School District's procedural violations, rather they want the decision based upon the merits of the IEPs put before them.

Later, counsel for the School District directly asked counsel for Grace's parents, if he did not intend to raise procedural issues in the case, whether he intended on behalf of Grace's parents to waive any violations that he perceived to exist. Counsel for Grace's parents responded, "I will." Based on these statements, the hearing panel determined that Grace's parents had waived any procedural violations that might exist. The hearing panel further determined that Grace's parents had presented no evidence of procedural violations. The hearing panel issued its decision against Grace's parents and in favor of the School District on all issues on September 12, 1997.

## II.  Standard of Review

The IDEA permits aggrieved parties to seek review of an administrative hearing panel's decision by bringing a civil action in federal district court. *See* 20 U.S.C. §

1415(i)(2)(A). On review, the district court must take into consideration not only the records of the administrative proceedings, but also any additional evidence submitted by the parties. *See* 20 U.S.C. § 1415(i)(2)(B). While the district court should make an independent determination of the issues based on a "preponderance of the evidence," 20 U.S.C. § 1415(i)(2)(B)(iii), the Supreme Court has emphasized that the district court must afford the administrative proceedings "due weight." *Board of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). The district court's standard of review is less deferential than that applied under the substantial evidence test that courts ordinarily apply in federal administrative law cases, however, a district court must give consideration "to the fact that the state hearing panel has had the opportunity to observe the demeanor of the witnesses." *Fort Zumwalt Sch. Dist. v. Clynes*, 119 F.3d 607, 610 (8th Cir. 1997), *cert. denied*, 118 S. Ct. 1840 (1998). Moreover, courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. This is because, as the *Rowley* court admonished, "courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" 458 U.S. at 208 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42 (1973)); *see also E.S. v. Independent Sch. Dist., No. 196*, 135 F.3d 566, 569 (8th Cir. 1998) (stating that judicial review under the IDEA is limited because "judges are not trained educators").

Whether a school district's IEP complies with the requirements of the IDEA is a mixed question of fact and law. *See E.S.*, 135 F.3d at 569. On appeal the standard of review of the district court's ultimate decision is de novo. *See id*.; *Fort Zumwalt*, 119 F.3d at 611. In the absence of a mistake of law, we review the district court's determination for clear error. *See E.S.*, 135 F.3d at 569.

### III.  Procedural Claims

A.     <u>Waiver</u>

Grace's parents argued to the district court that the School District deprived them of their procedural rights under the IDEA by failing to afford them an opportunity to participate equally in the development of Grace's IEP at the IEP meeting. The district court sustained their challenge and reversed the hearing panel's determination that the School District committed no procedural violations in handling Grace's claims. In so doing, the court rejected the School District's argument that Grace waived any existing procedural claims at the administrative due process hearing. The court acknowledged that Grace's counsel "did profess to waive 'procedural violations' in his opening statement at the due process hearing." Nevertheless, the court noted that in a post-hearing brief Grace's counsel argued that he did not intend to waive all procedural issues, but only procedural "technicalities," such as forms of notice, dates, times and places of the due process proceedings. Upon reviewing the administrative record the court also found that Grace's parents offered testimony at the due process hearing regarding the conduct of school district personnel during the IEP meeting. The court determined that this testimony was inconsistent with the hearing panel's conclusion that Grace's parents waived procedural objections to the manner in which the School District conducted the meeting. We disagree.

It is difficult to imagine how Grace's counsel could have set forth her parents' intent to waive their procedural objections more clearly. Counsel's broad declaration that Grace's parents sought a determination based only on the merits of the proposed IEPs undermines his post-hoc attempt after the hearing to narrow the scope of the waiver to matters of a more technical nature. Moreover, the testimony that Grace's parents presented at the hearing, when interpreted in light of counsel's explicit waiver, amounts to no more than background evidence relating to their substantive challenge to the proposed IEP's. The basic issues that they raised before the hearing panel for determination did not include a procedural challenge. Thus, we conclude that Grace's parents did not properly raise at the administrative level the issue of whether the School District permitted them to participate sufficiently in the development of her IEP.

This failure is significant, because under well-established judicial interpretations of the IDEA Grace had an obligation to exhaust her administrative remedies with regard to the issues upon which she seeks judicial review. *See* 20 U.S.C. § 1415(i)(2)(A) (stating that a party aggrieved by the due process hearing panel's decision has the right to bring a civil action "with respect to the complaint presented"); *see also, e.g., Honig v. Doe*, 484 U.S. 305, 326-27 (1988); *Independent Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 560 (8th Cir. 1996); *Urban v. Jefferson County Sch. Dist. R-1*, 89 F.3d 720, 724 (10th Cir. 1996); *Babicz v. School Bd.*, 135 F.3d 1420, 1422 (11th Cir. 1998), *cert. denied*, 119 S. Ct. 53 (1998); *Garro v. Connecticut*, 23 F.3d 734, 737 (2nd Cir. 1994); *Family & Children's Center, Inc. v. School City of Mishawaka*, 13 F.3d 1052, 1056 (7th Cir. 1994), *cert. denied*, 513 U.S. 961 (1994); *Crocker v. Tennessee Secondary Sch. Athletic Ass'n*, 873 F.2d 933, 935 (6th Cir. 1989) (interpreting the IDEA's precursor, the Education of the Handicapped Act). The exhaustion requirement permits agencies "to exercise discretion and apply their expertise, . . . allow[s] complete development of the record before judicial review, . . . prevent[s] parties from circumventing the procedures established by Congress, and . . . avoid[s] unnecessary judicial decisions by giving the agency an opportunity to correct errors." *See Urban*, 89 F.3d at 724. The Tenth Circuit in *Urban* applied the exhaustion rule to bar a claim similar to the challenge raised here, asserting that a school district violated the IDEA's procedural requirements by failing to afford a child's parents adequate participation rights in the development of his IEP. *Id.*

Because Grace did not properly submit this claim for the hearing panel's determination, it is barred unless an exception to the exhaustion rule applies. Courts recognize only three exceptions to the exhaustion requirement, including futility, inability of the administrative remedies to provide adequate relief, and the establishment of an agency policy or practice of general applicability that is contrary to law. *See id.* None of these exceptions applies to Grace's claim against the school district. Grace has offered no evidence demonstrating that her administrative remedies would have been futile or inadequate, nor has she shown that the school district was

acting on a general policy of developing IEPs without adequate parental participation. For these reasons we find that Grace waived her procedural claim explicitly during the administrative due process hearing, and furthermore, that she failed to exhaust her administrative remedies with regard to this claim. Her claim is barred for these reasons.

## B.     **Procedural Compliance**

Even assuming that Grace's parents had properly raised their procedural objection to the administrative hearing panel, the record does not support the district court's conclusion that the School District's IEP should be set aside on the ground that it deprived Grace's parents of their procedural rights. Procedural deficiencies in the development of a child's IEP warrant rejecting the IEP only if they "compromised the pupil's right to an appropriate education, seriously hampered the parent's opportunity to participate in the formulation process, or caused a deprivation of educational benefits." *S.D.*, 88 F.3d at 562 (internal quotations omitted). Such circumstances are not present in this case.

Grace's parents concede that the School District provided them with proper notice of their procedural rights under the IDEA, that it gave them sufficient opportunities to review Grace's records, that it provided them with notice of the IEP meeting's date and purpose, that it invited them to attend that meeting, and that they signed the IEP, either before or after the meeting, to indicate their participation in developing it.

They nevertheless assert that the School District failed to provide them with a meaningful opportunity to participate in the development of Grace's IEP. They specifically contend that the School District inappropriately drafted Grace's IEP in their absence, that they did not subjectively understand the purpose of the IEP meeting, and

that the School District imposed its proposal on them at the IEP meeting as passive listeners without soliciting their input.

The record does not support reversing the hearing panel's decision on these grounds. The fact that the School District developed an unfinished draft of Grace's IEP in advance of the meeting is not cause for concern, as nothing in the IDEA or its regulations prohibits a school district from coming to an IEP meeting with tentative recommendations for its development prepared in the parents' absence. *See* 34 C.F.R. pt. 300 app. C ¶ 55 (stating that although it is not permissible for an agency to finalize the IEP before the IEP meeting begins, the agency may come to the meeting prepared with proposals as long as the parents are informed at the outset that they are merely recommendations for review and discussion). Moreover, the record shows that School District personnel reviewed the pre-drafted "present level of performance" and "goals and objectives" sections of the IEP with Grace's parents carefully and asked whether they agreed with the statements contained therein.

Grace's parents argue that they did not understand that in giving their agreement they were participating in the development of her IEP. This misunderstanding is unfortunate, however, Grace's parents have not shown that it was caused by any wrongdoing on the part of the School District. When, as in this case, a school district provides parents with proper notice explaining the purpose of the IEP meeting, the meeting is conducted in a language that the parents can understand, *see* 34 C.F.R. § 300.345(e), the parents are of normal intelligence, and they do not ask questions or otherwise express their confusion about the proceedings, the school district's failure to apprehend and rectify that confusion does not constitute a violation of the IDEA's procedural requirements.

More importantly, the main point of contention between Grace's parents and the School District arises not from the development of the "present level of performance" and "goals and objectives" portions of her IEP, but from the School District's

placement recommendation. Grace's parents admit that they did not attend the IEP meeting with the expectation that the parties would consider the available options and develop a plan for Grace together, but rather, with the expectation that the School District without discussion would agree to reimburse them for their costs in educating Grace at home through the Institutes's program. Their disillusionment upon learning that the School District recommended a different course of action angered them and they abruptly terminated the meeting before the parties could reach a resolution to their conflicting proposals. In so doing, Grace's parents truncated their own procedural right to contribute to the development of her IEP. The School District cannot be faulted for failing to engage in an open discussion with Grace's parents about alternative options for her placement, when the parents themselves refused to participate in a discussion with the School District at the first hint of disagreement with the plan they advocated.

A school district's obligation under the IDEA to permit parental participation in the development of a child's educational plan should not be trivialized. *See Rowley*, 458 U.S. at 205-06 ("It seems to us no exaggeration to say that Congress placed every bit as much emphasis on compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . as it did upon the measurement of the resulting IEP against a substantive standard."). Nevertheless, the IDEA does not require school districts simply to accede to parents' demands without considering any suitable alternatives. In this case, the record shows that the School District considered both the possibility of providing Grace with in-home instruction and the possibility of reimbursing her parents for the cost of educating her at home through the Institutes, but rejected these options on the ground that they would not provide her with sufficient interaction with other children. The School District's adherence to this decision does not constitute a procedural violation of the IDEA simply because it did not grant Grace's parents' request. For these reasons we agree with the hearing panel's determination that the School District did not deprive Grace's parents of their procedural rights.

# IV. Substantive Claims

## A. <u>Burden of Proof</u>

At Grace's administrative due process hearing the School District had the burden of proving that its proposed IEP would satisfy the requirements of the IDEA and provide Grace with a free appropriate public education. *See E.S.*, 135 F.3d at 569. On appeal to the federal courts, however, Grace and her parents have the burden of proof because they are challenging the outcome of the administrative hearing panel's decision. *See id.* In order to obtain reimbursement for the costs of educating Grace privately through the Institutes's program, Grace's parents must demonstrate that (1) the School District's proposed IEP would not have provided Grace with a free appropriate public education; and (2) the Institutes's program complied with the IDEA. *See Fort Zumwalt*, 119 F.3d at 611.

## B. <u>The IDEA's Substantive Requirements</u>

School districts that accept federal funds under the IDEA must provide each qualifying disabled child within their jurisdictions with a "free, appropriate public education." 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1)(A). A school district must tailor such education to meet the unique needs of each disabled child, *see* 20 U.S.C. § 1400(d)(1)(A). A school district addresses this goal through the development of an IEP for each child setting forth her present level of performance, annual goals and objectives, specific services to be provided, an explanation of the extent to which she will not receive education with nondisabled children, a statement of modifications to district-wide assessment procedures needed in order for her to participate in such assessments, transition services needed, the projected dates and duration of proposed services, and objective criteria and evaluation procedures. *See* 20 U.S.C. § 1414(d).

Although the IDEA mandates individualized "appropriate" education for disabled children, it does not require a school district to provide a child with the specific educational placement that her parents prefer. *See E.S.*, 135 F.3d at 569. Nor does the IDEA require a school district to "either maximize a student's potential or provide the best possible education at public expense." *Fort Zumwalt*, 119 F.3d at 612. The purpose of the IDEA is "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Rowley*, 458 U.S. at 192. The IDEA's requirements thus are satisfied when a school district provides individualized education and services sufficient to provide disabled children with "some educational benefit." *Id.* at 200.

Nonetheless, the IDEA defines the "free appropriate public education" that a school district must provide to include instruction and services that meet state educational standards. *See* 20 U.S.C. § 1401(8)(B); *Rowley*, 485 U.S. at 203. When a state provides for educational benefits exceeding the minimum federal standards set forth under *Rowley*, the state standards are thus enforceable through the IDEA. *See Johnson v. Independent Sch. Dist. No. 4*, 921 F.2d 1022, 1029-30 (10th Cir. 1990), *cert. denied*, 500 U.S. 905 (1991); *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 982-83 (4th Cir. 1990); *Board of Educ. of East Windsor Reg'l Sch. Dist. v. Diamond*, 808 F.2d 987, 992 (3rd Cir. 1986); *David D. v. Dartmouth Sch. Comm.*, 775 F.2d 411, 418 (1st Cir. 1985), *cert. denied*, 475 U.S. 1140 (1986). Several courts accordingly have determined that higher state educational standards are applicable to a student's IDEA claim brought in that state. *See Burke*, 895 F.2d at 982-83 (interpreting North Carolina law); *Diamond*, 808 F.2d at 992 (interpreting New Jersey law); *David D.*, 775 F.2d at 418 (interpreting Massachusetts law). *But see O'Toole v. Olathe Dist. Sch. Unified Sch. Dist. No. 233*, 144 F.3d 692, 701 (10th Cir. 1998) (holding that Kansas law does not provide for a heightened standard); *Johnson*, 921 F.2d at 1029-30 (holding that Oklahoma law does not provide for a heightened standard).

Grace's parents argue that Missouri state law requires school districts to provide instruction and services sufficient to maximize the capabilities of disabled children. Grace's parents raise the issue of whether Missouri law establishes a higher educational standard than the federal standard set forth in *Rowley* for the first time on appeal. Although the district court speculated sua sponte that a higher standard might apply, the court ultimately declined to resolve the issue and applied the rule set forth in *Rowley* to Grace's claims. Because Grace's parents did not properly raise this issue before the district court and the district court did not decide it, we decline to consider it for the first time on appeal. *See von Kerssenbrock-Praschma v. Saunders*, 121 F.3d 373, 377-78 (8th Cir. 1997) (declining to consider argument regarding standard of review applicable to Missouri state statute, because district court did not address it); *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 611 n.2 (8th Cir. 1994), *cert. denied*, 513 U.S. 948 (refusing to consider claim raised for the first time on appeal). We accordingly address Grace's claims under the *Rowley* standard.

## C.    Sufficiency of the School District's Proposed IEP

The School District challenges the district court's determination that its proposed IEP is not reasonably calculated to offer Grace a free appropriate public education as defined in *Rowley*. The School District argues that in reversing the unanimous decision of the hearing panel, the district court failed to give its findings "due weight," and instead substituted the court's own notions of sound educational policy. We agree.

The district court relied heavily on the results of Grace's therapy through the First Steps Program in making its determination. The district court noted that both the School District's proposed program and the First Steps program employed "traditional therapies." Asserting that Grace benefitted minimally from the First Steps program as compared to her progress in the Institutes's program, the district court concluded that Grace would be capable of making only trivial progress under the School District's IEP. Thus, although Grace never received instruction in the School District's proposed

program, the district court concluded that she could not benefit from that instruction because she allegedly failed to progress in a completely separate program utilizing similar methodology.

This analysis is flawed for several reasons. The district court's conclusion that Grace made little progress in the First Steps program is of questionable accuracy. The record demonstrates that although she made little to no progress in developing her fine motor skills as a participant in this program, her gross motor skills improved significantly. Moreover, gauging the sufficiency of Grace's progress in the First Steps program by comparing it to her progress in the Institutes's program is inappropriate. Under the applicable standard, the School District must only provide Grace with "some educational benefit" and need not give her the best education possible. *See Rowley*, 458 U.S. at 200. Thus, whether Grace's progress in the Institutes's program would exceed her progress under more traditional therapies is irrelevant. Furthermore, the two programs are not comparable. As a participant in the First Steps program Grace received therapy for only 120 minutes per week, while under the Institutes's program she received instruction for 12 hours per day. Any increases in Grace's progress under the Institutes's program therefore could be attributed solely to the amount of instruction she received.[4]

Moreover, even assuming that the Grace made no progress whatsoever in the First Steps program, such a failure would not be indicative of Grace's potential progress under the School District's proposed plan. The School District's IEP would have provided Grace with 720 minutes of instruction per week, in comparison with the 120 minutes offered to her in the First Steps program. The School District's program further would have given Grace a kind of classroom instruction with individualized goals that the First Steps program did not provide. Also, because the School District's

---

[4]Grace's parents concede that the IDEA does not require the School District to provide Grace with instruction for twelve hours per day.

program is not connected with the First Steps program, Grace would have learned from different instructors and therapists under the School District's plan who would have employed different skills and techniques. The only concrete similarity between the First Steps program and the School District's IEP is that both programs implemented some of the same traditional methodologies. In rejecting these "traditional" methods in favor of the Institutes's techniques, the district court imposed its own theories of education on the School District and rejected the significant expertise of school authorities and hearing panel members.

The court also criticized the School District on the ground that it based the IEP on an inadequate diagnostic evaluation of Grace. The district court concluded that the School District's team of evaluators spent too little time observing Grace, and that they inaccurately administered one of the tests upon which Grace's diagnostic summary was based. In making these observations the district court failed to acknowledge that the School District notified Grace's parents of their statutory right to request an independent evaluation of Grace, and that they expressly declined to exercise that right. Because they chose not to seek a reevaluation of Grace, they cannot now be heard to complain about the manner in which the school district evaluated her.

In further support of its decision the district court credited the testimony of Grace's parents and of expert witnesses testifying on her behalf, and rejected the contradictory testimony of the school district's employees and experts. In making this assessment the district court reviewed a dry record consisting only of the transcript of Grace's due process hearing, various documents and exhibits submitted at the hearing, and supplemental deposition transcripts submitted directly to the district court. Despite the fact that the district court had no first-hand opportunity to hear any of the testimony it was evaluating, it found more credible the expert opinions submitted by Grace's parents because some of the school district's witnesses were concurrently or previously employed by the school district, and because others had not had an opportunity to examine Grace. In so doing, the district court ignored this Court's admonition in

*Zumwalt* that a district court should give consideration to "the fact that the state hearing panel has had the opportunity to observe the demeanor of the witnesses." 119 F.3d at 610. We find that the district court should have given greater weight to the hearing panel's decision, and thus credited the testimony of the school district's experts who testified that the School District's proposed IEP is reasonably calculated to provide Grace with a free, appropriate public education. We accordingly reverse the district court's decision.

**D.      Sufficiency of the Institutes's Program**

Because we find that the School District's proposed IEP satisfies the IDEA's substantive requirements, we need not address the sufficiency of the Institutes's program. *See Zumwalt*, 119 F.3d at 611 (requiring parents who seek reimbursement for private placement to prove both that the school district has not offered a free appropriate public education, and that the private placement is in compliance with the IDEA). We nevertheless note that Grace's instruction through the Institutes fails to satisfy one of the primary objectives set forth in the IDEA, namely, to educate disabled children in a classroom along with children who are not disabled to the maximum extent possible. *See* 20 U.S.C. § 1412(5)(A); *see also Rowley*, 458 U.S. at 202 (noting that the statutory language reflects a "mainstreaming preference"); *S.D.*, 88 F.3d at 561 (finding that the statutory language gave rise to a presumption in favor of the defendant's placement in the public schools). This policy does not mandate placement with non-disabled children when a child is so severely disabled that such placement would not provide an educational benefit, *see* 20 U.S.C. § 1412(5)(A), however, we have already determined that School District's proposed placement of Grace in a reverse mainstream classroom would have provided her with an appropriate education. We accordingly conclude that the Institutes's program is not in compliance with the IDEA because it does not offer her an education in the least restrictive environment.

## V.  Attorney's Fees and Costs

The district court awarded Grace and her parents their attorney's fees and costs on the ground that they were the prevailing parties in this action.  Because we reverse the district court's determination of appellee's IDEA claims we also reverse the district court's award of attorney's fees.

## VI.  Conclusion

The judgments entered on appellee's IDEA claim and motion for attorney's fees and costs are reversed, and the case is remanded to the district court with directions to reinstate the decision of the administrative hearing panel.


A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.