# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3419

_____

Fort Osage R-1 School District,          *
                                                      *

          Plaintiff - Appellee,       *

                                                      *

         v.                             *

                                                      * Appeal from the United States

Brandon Sims, on behalf of his       * District Court for the

daughter, B.S., a minor; Nichole Sims,  * Western District of Missouri.

on behalf of her daughter, B.S., a     *

minor,                                 *

                                                      *

          Defendants - Appellants.   *

_____

Submitted: May 11, 2011
Filed:  June 17, 2011

_____

Before MELLOY and SMITH, Circuit Judges, and GRITZNER,[1] District Judge.

_____

MELLOY, Circuit Judge.

Brandon and Nichole Sims, on the behalf of their disabled daughter, B.S., appeal the district court's[2] finding that the Fort Osage R-1 School District ("School

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa, sitting by designation.

[2]The Honorable Fernando J. Gaitan, Jr., Chief Judge, United States District Court for the Western District of Missouri.

District") offered B.S. a free appropriate public education ("FAPE") within the meaning of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, for the 2006-2007 school year. The Sims seek reimbursement for their costs of placing B.S. at a private facility during that school year. Because we agree with the district court that the School District offered to provide B.S. with a FAPE, we affirm.

I.

At birth, B.S. was diagnosed with Down's Syndrome, and thereafter, she received early intervention services through the Missouri First Steps Program for her cognitive and physical disabilities. B.S. also received private instruction and several types of therapy from private providers. On June 15, 1999, just prior to her third birthday, the School District prepared an initial-evaluation report to determine B.S.'s eligibility under the IDEA. Importantly, nothing in the evaluation report suggested that B.S. suffered from autism, and, as of that time, no professional had indicated such.

On June 20, 1999, after concluding that B.S. satisfied the criteria for early childhood special education under the IDEA for her developmental delays, the School District developed an individualized educational program ("IEP") for B.S. An "IEP is a comprehensive written statement developed jointly by the child's parents and the school district, which outlines the child's special educational needs and the specially designed instruction and services to be provided by the school system to meet those needs." M.P. ex rel. K. v. Indep. Sch. Dist. No. 721, 326 F.3d 975, 977 n.1 (8th Cir. 2003) (citing 20 U.S.C. § 1414(d)). Under the June 20, 1999 IEP, B.S. received special educational services, as well as speech-language, occupational, and physical therapy. The underlying records reveal that B.S. made some progress toward her occupational therapy goals during the 1999-2000 school year.

On May 11, 2000, in accordance with the federal requirement to review IEPs at least annually, 20 U.S.C. § 1414(d)(4), the School District met with the Sims and developed a new IEP for B.S. for the upcoming 2000-2001 school year. The May 11, 2000 IEP, as modified by a subsequent agreement on November 10, 2000, set new goals for B.S., provided for additional services, and required the school to provide the Sims with progress notes. The progress notes reveal that B.S. made headway on many of her goals and even achieved some of them.

In the following years, the School District periodically reviewed B.S.'s progress and created new IEPs based upon her changing needs. More specifically, the School District drafted new IEPs in the winter of 2001 and in the springs of 2002, 2003, and 2004. The progress reports from each of these years generally indicate that B.S. was making meaningful progress on her evolving IEP goals. Additionally, during this time period, neither the School District nor the Sims suggested that B.S. suffered from autism, although B.S.'s teachers and the Sims did note some negative behavioral changes in the latter part of 2004.

On January 25, 2005, after expressing some concerns in a December 6, 2004 meeting with the School District, the Sims had B.S. evaluated by Jamie Prestage, an independent psychologist. In making her evaluation, Prestage neither sought input from the School District's personnel nor observed B.S. in a school setting. Prestage did, however, administer the Childhood Autism Rating Scale ("CARS"), with the Sims serving as the informants, and she concluded that B.S. met the diagnostic criteria for autism. In the view of Becky Hughes, the School District's autism and behavioral consultant, and Beverly Emery, B.S.'s special education teacher from 2002-2006, the CARS is not a diagnostic tool and is very subjective.

On March 4, 2005, the School District met with the Sims to consider Prestage's independent diagnosis of autism, as well as other outside evaluations obtained by the Sims. At the Sims's request, and after considering the School District's assessments

of B.S., the School District decided to acquire additional information to discern if B.S. met the criteria for autism or another disabling condition. The School District eventually proposed having a contract autism consultant observe B.S., and in May 2005, the School District repeatedly met with the Sims to discuss the results and craft a new IEP. In the final May 2005 IEP, the School District agreed that B.S. met the state criteria for "other health impaired," a generic disability category, based upon the medical diagnoses of Down's Syndrom and autism (although the School District did harbor some concerns that the tests results showing that B.S. met the criteria for autism were skewed by her other developmental delays). The IEP further provided for 1065 minutes per week of specialized instruction, 90 minutes per week of speech therapy, 60 minutes per week of language and occupational therapy, sensory rich experiences, extended time to process information, positive reenforcements, individual low sensory instruction, and a daily communication log. In addition, the IEP set numerous goals. According to the progress reports, B.S. was still making progress as she concluded the 2004-2005 school year.

During the 2005-2006 school year, the School District met with the Sims numerous times to review B.S.'s progress and modify her IEP. On February 20, 2006, the School District met with the Sims and modified B.S.'s IEP. B.S. had been increasingly engaging in negative behaviors, and the School District modified her IEP to state that she was now displaying behaviors that impeded her learning. The School District further agreed to the Sims's request for a functional behavioral assessment, which Hughes conducted on March 26, 2006. Although Hughes did not obverse any significant behaviors from B.S., Hughes still assisted in creating a behavioral intervention plan, which the School District finalized on May 4, 2006. Significantly, after Emery began implementing the behavior plan, B.S. exhibited no additional negative behavior for the remainder of the school year. Finally, based upon her observations, Hughes concluded that B.S. did not meet the Missouri IDEA criteria for autism.

On May 17, 2006, the Sims sent a letter to the School District stating that B.S. was not receiving a FAPE and that they were "hereby giving [the School District] our ten day notice that we will be withdrawing [B.S.] and placing her in a more appropriate educational setting." The Sims also informed the School District that they "may be seeking" reimbursement for placing B.S. at a private facility.[3]

The same day, the School District contacted the Sims and requested a time to meet in order to finalize an IEP for the 2006-2007 school year. The School District met with Brandon Sims on June 13, 2006 and drafted a new IEP that offered B.S. 1490 minutes of specialized instruction in academics, 150 minutes of speech-language therapy, 60 minutes of occupational therapy, and 325 minutes of regular education per week. The IEP further stated that B.S. would be mainstreamed for lunch, recess, music, physical education, field trips, and assemblies—all with the assistance of a paraprofessional. In addition, the IEP offered numerous accommodations, including sensory rich experiences, use of an adaptive keyboard, a daily communication log, an FM hearing system, priming, and an augmentative communication device. The IEP also reviewed her prior and current level of academic achievement, noted B.S.'s substantial progress towards her previous goals, and set numerous new goals for the following year. Finally, the June 13, 2006 IEP contained an extensive behavioral plan and indicated that B.S. was diagnosed with autism and met the Missouri definition of other health impaired.

The School District had no opportunity to implement the June 13, 2006 IEP because B.S. ceased attending the School District after May 25, 2006. Instead, B.S. attended the Rainbow Center, a private educational facility, for the 2006-2007 and the 2007-2008 school years. During this time, in November 2006, the Sims contacted the School District for an IEP meeting in order to discuss B.S.'s progress. The School

---

[3]Nichole Sims later testified that the letter was prompted in part by her concern that B.S. would be moved from Emery's classroom to another teacher's classroom.

District declined the request because B.S. was no longer enrolled. The School District, however, offered to meet with the Sims as soon as B.S. re-enrolled. On January 4, 2007, the Sims again enrolled B.S. in the School District, and on January 10, 2007, the School District met with them. After reviewing B.S.'s records, the School District decided it needed more information and postponed formulating an IEP. On April 2, 2007, following several meetings with the Sims, the School District finalized a new IEP for B.S. In the April 2, 2007 IEP, the School District offered to provide substantial services and to purchase a new communication device for B.S. The Sims did not, however, decide whether to accept this new IEP. After some subsequent discussions with the School District, the Sims ultimately initiated an IDEA due process proceeding on April 16, 2007, claiming that the School District was failing to provide B.S. with a FAPE and requesting private placement and reimbursement for having sent B.S. to the Rainbow Center.

A three-member administrative panel ("Panel") empowered by the Missouri State Board of Education heard the matter and held a twenty-nine day hearing in which fourteen witnesses testified. At the hearing, the Sims argued that the School District failed to meet the procedural and substantive requirements of the IDEA, thereby denying B.S. a FAPE. To support their procedural argument, the Sims alleged that the School District withheld critical information concerning B.S. prior to the June 13, 2006 IEP. To support their substantive argument, the Sims alleged that the June 13, 2006 IEP and the April 2, 2007 IEP failed to properly account for B.S.'s autism and, as a result, failed to provide appropriate services. The Panel agreed in part.

A two-member majority of the Panel found a procedural violation of the IDEA and concluded that the School District failed to provide B.S. with a FAPE during most of the 2006-2007 school year because the School District denied the Sims a meaningful ability to participate in the formation of the June 13, 2006 IEP. The Panel held that the School District had a duty of candor to the Sims and that the School District violated this duty and precluded the Sims from participating in the IEP

process when various personnel withheld their opinions concerning B.S. The Panel rested its opinion on the factual finding that Emery admittedly withheld her opinion and that Emery was silenced at a May 26, 2006 IEP meeting by another School District employee. The Panel further based its decision on the factual findings that Ms. Terrill, a regular education teacher, advised Brandon Sims that she was restricted by the School District in what she could say and that Nancy Mulford, a regular education teacher who taught B.S. during the 2005-2006 school year, failed to inform the Sims that she thought the programing offered to B.S. was not appropriate. The Panel found, however, that the procedural taint from the June 13, 2006 IEP did not affect the April 2, 2007 IEP and, as a result, that the School District resumed providing a procedurally sound FAPE to B.S. on April 2, 2007. Accordingly, the Panel ordered the School District to reimburse the Sims for the cost of placing B.S. at the Rainbow Center during the 2006-2007 school year.

The Panel also decided it was advisable to consider whether the School District substantively complied with the IDEA. A different two-member majority held that the School District did substantively comply with the IDEA and otherwise offered B.S. a FAPE for a variety of reasons. In coming to this conclusion, the Panel rejected the Sims's argument that the purported failure of the June 13, 2006 IEP to identify B.S. as suffering from autism rendered the IEP substantively flawed. The Panel reasoned that the diagnostic label attached to a disabled student is not particularly important because "the transcending consideration is whether a district developed an IEP that addressed the manifestations of a student's conditions and addressed his/her needs." Applying this principle, the Panel held that the June 13, 2006 IEP was substantively adequate because it was tailored to B.S.'s unique needs. The Panel also expressly refused to find whether B.S. suffered from autism and found no substantive concerns with the April 2, 2007 IEP.

The School District subsequently filed suit in the district court, claiming that the Panel erred in finding that the School District procedurally violated the IDEA and

deprived B.S. of a FAPE. The School District moved for a judgment on the administrative record, and the district court granted the motion after carefully reviewing the record and weighing the evidence for itself. The district court held that the School District did not deprive the Sims of a meaningful ability to participate in the formation of the June 13, 2006 IEP because the record did not show that the School District withheld any material information. More specifically, the district court found that Emery only withheld her opinion on the Sims's failure to follow through on an-agreed-to discipline plan.[4] The court concluded that this omission was immaterial to the IEP. As to Emery being silenced on May 26, 2006, the district court found that insufficient evidence existed mostly because Emery could not remember the incident. Likewise, the district court rejected the notion that Ms. Terrill told Brandon Sims that the School District was restricting what she could say because the Sims did not call Ms. Terrill to testify and because Brandon Sims's testimony on the subject was "vague hearsay." The district court finally rejected the significance of Mulford's testimony that she failed to disclose her disapproval of the June 2006 IEP because Mulford only saw B.S. for 30-35 minutes per day during 2005-2006, whereas Emery, B.S.'s primary teacher, stood in a "much better position to discuss [B.S.'s] educational program."

In addition, the district court rejected the Sims's other procedural argument, namely that the School District violated the IDEA in crafting the June 13, 2006 IEP by predetermining the services for and placement of B.S. This, according to the Sims, effectively denied them a meaningful ability to participate in the process. The district court, however, found that this claim was unsupported by the record because "there [was] no indication or suggestion that the IEP team was not willing to listen or work with the [Sims]."

---

[4]Emery testified that she withheld her negative opinion regarding the Sims's conduct in order to preserve her working relationship with them.

The district court finally considered whether the June 13, 2006 and the April 2, 2007 IEPs substantively complied with the IDEA and provided B.S. with a FAPE. The district court found in the affirmative, resting its decision on the factual findings that all of B.S.'s IEPs described, at length, B.S.'s level of educational performance, articulated "how her disability affected her involvement and progress in the general curriculum," and included meaningful goals. Just as with the Panel, the district court passed on deciding whether B.S. suffered from autism, apparently agreeing with the Panel's determination that such a finding "was of no legal consequence." Finding no violation of the IDEA, the district court did not require the School District to reimburse the Sims for the costs of unilaterally placing B.S. at the Rainbow Center. The Sims appeal.

## II.

"The IDEA seeks to ensure that all disabled children receive a free appropriate public education (FAPE) designed to meet their needs." C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347, 591 F.3d 624, 630 (8th Cir. 2010) (citing 20 U.S.C. § 1400(d)(1)(A)). School districts receiving federal funds under the IDEA must provide all qualifying disabled children within their jurisdictions with a FAPE and must do so through developing an IEP for each child. Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 658 (8th Cir. 1999) (citing 20 U.S.C. § 1414(d)). "In developing a child's IEP each academic year, the school district must comply with the procedures set forth in the IDEA, and ensure that the IEP is 'reasonably calculated to enable the child to receive educational benefits.'" C.B. ex rel. B.B. v. Special Sch. Dist. No. 1, Minneapolis, Minn., 636 F.3d 981, 989 (8th Cir. 2011) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 206–07 (1982)).

Parents and guardians of a disabled child may challenge the procedural and substantive reasonableness of an IEP by requesting an administrative due process hearing, and "the party aggrieved by the outcome of the hearing process may file suit

in state or federal court" pursuant to 20 U.S.C. § 1415(i)(2). C.N., 591 F.3d at 630. "In lawsuits filed under section 1415(i)(2), the district court is required to receive the records of the administrative proceedings, hear additional evidence at the request of a party, and independently determine the appropriate relief based on a preponderance of the evidence," while still giving "due weight to the factual findings of the administrative panel." Hansen ex rel. J.H. v. Republic R-III Sch. Dist., 632 F.3d 1024, 1026 (8th Cir. 2011). The district court must also avoid substituting its "own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206.

When considering the merits of an IDEA claim, the district court should only set aside an IEP on procedural grounds when the "procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." Lathrop R-II Sch. Dist. v. Gray, 611 F.3d 419, 424 (8th Cir. 2010) (internal quotation marks omitted). Likewise, the substantive requirements of the IDEA are "satisfied when a school district provides individualized education and services sufficient to provide disabled children with some educational benefit." Blackmon, 198 F.3d at 658 (internal quotation marks omitted). As such, the district court must be careful not to require more from an IEP because the "IDEA does not require that a school either maximize a student's potential or provide the best possible education at public expense." Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 612 (8th Cir. 1997). In considering the district court's ultimate decision, we review findings of fact for clear error and questions of law de novo, including the mixed question of whether an IEP is reasonably calculated to provide some educational benefit. Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022, 1027 (8th Cir. 2003).

A.

The Sims argue that the June 13, 2006 IEP is procedurally and substantively flawed because the School District failed to properly evaluate and fully identify B.S.'s disabilities. The Sims assert that B.S. suffers from autism and that the School District's failure to recognize this diagnosis in the June 13, 2006 IEP rendered the IEP procedurally flawed. According to the Sims, the IDEA requires school districts to correctly identify a child's disability. For support, the Sims rely on a portion of the IDEA that requires all IEPs to state "how the child's disability affects the child's involvement and progress in the general education curriculum." 20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa). The Sims reason that an IEP cannot adequately state how a child's disability affects their progress if the IEP incorrectly identifies the disability. The Sims also rely on a federal regulation that permits parents to initiate due process hearings regarding the "identification, evaluation or educational placement of a child with a disability," arguing that the proper identification is separate from whether an IEP is meeting a disabled child's needs. 34 C.F.R. § 300.507(a)(1).

The Sims alternatively argue that even if the June 13, 2006 IEP is procedurally sound, the IEP is substantively defective because, without a proper acknowledgment that B.S. suffered from autism, the School District could not—and did not—tailor the educational program to B.S.'s unique needs. The Sims specifically assert that the IEP was substantively flawed because it lacked a proper behavioral management program and lacked educational programing customized to the learning style of an autistic child. For support, the Sims assert that B.S. failed to make any meaningful progress while attending the School District and was increasingly acting out in a manner that interfered with her learning. We disagree.

One of the express purposes of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their *unique needs* and prepare

-11-

them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A) (emphasis added). Consistent with this purpose, the IDEA directs school districts to evaluate qualifying children "in all areas of suspected disability" and customize educational programs to their specific needs. 20 U.S.C. § 1414(b)(3)(B), (d); see also Blackmon, 198 F.3d at 658 ("A school district must tailor such education to meet the unique needs of each disabled child."). The federal regulations interpreting the IDEA further reenforce this individualized, need-oriented approach, stating in part that school districts must ensure that: "In evaluating each child with a disability . . . , the evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.532(h) (2006) (current version at 34 C.F.R. § 300.304(c)(6)).

Given the IDEA's strong emphasis on identifying a disabled child's specific needs and addressing them, we believe that the particular disability diagnosis affixed to a child in an IEP will, in many cases, be substantively immaterial because the IEP will be tailored to the child's specific needs. Consequently, while the IDEA intends that IEPs contain accurate disability diagnoses, we will not automatically set aside an IEP for failing to include a specific disability diagnosis or containing an incorrect diagnosis. See generally 20 U.S.C. § 1414(d) (stating the general requirements of an IEP). Instead, as with any other purported procedural defect, the party challenging the IEP must show that the failure to include a proper disability diagnosis "compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." Lathrop, 611 F.3d at 424 (internal quotation marks omitted).

In this case, the Sims cannot make such a showing. As an initial matter, we are skeptical that the June 13, 2006 IEP failed to properly acknowledge any of B.S.'s disabilities. The IEP, in fact, states B.S. has been diagnosed with autism and meets the Missouri criteria for other health impaired, presumably based upon the medical

diagnosis of autism as expressly stated in a previous IEP. Given the mixed record on whether B.S. actually suffers from autism or merely displays some autistic traits as a result of her other disabilities, we find it difficult to discern how the IEP failed to adequately identify B.S.'s disabilities. However, even assuming that B.S. does suffer from autism, and that the IEP materially failed to include this diagnosis, the Sims cannot show that this purported procedural error was harmful. This is because the IEP was substantively reasonable and because the error did not deprive B.S. of any educational benefits. As the Panel and the district court found, the thirty-one page IEP and accompanying two page behavioral plan detailed, at length, B.S.'s current educational status, set meaningful goals, and provided a tremendous amount of resources to assist B.S. We can find little support in the record that the IEP was not "reasonably calculated to enable [B.S.] to receive educational benefits," especially since B.S. had consistently progressed under previous IEPs and because B.S. had displayed *no* negative behaviors after the first, formal behavioral plan was implemented.[5] This is not a case where the student's progress was illusory or where the student's ability to progress was undercut by unaddressed behavioral difficulties. See Neosho, 315 F.3d at 1029–30 (rejecting an IEP as substantively unreasonable because of the evidence of de minimis progress by the student, which was further compromised by unchecked behavioral problems). Moreover, the IEP would not have materially changed if it had included a diagnosis of autism because, as just stated and as the district court found, the IEP was highly customized to meet B.S.'s specific needs. Accordingly, we can find no material procedural or substantive error in the June 13, 2006 IEP.

---

[5]We note that the Sims failed to expressly argue that any factual findings were clearly erroneous; however, even if the Sims had so argued, our decision would not change because the record strongly supports all of the district court's factual findings.

B.

The Sims further argue that the June 13, 2006 IEP is procedurally defective because the School District predetermined the educational program to be provided to B.S., including placement, without adequately considering the Sims's evidence of B.S.'s needs or their concerns. This, according to the Sims, effectively precluded them from meaningfully participating in the formulation of the June 13, 2006 IEP. Within this argument, the Sims also assert that the School District precluded their ability to participate by causing various School District personnel to withhold opinions concerning B.S.'s needs and the propriety of the School District's IEP. We disagree.

"Parents and guardians play a significant role in the IEP process," and a school district cannot refuse to consider their concerns or evidence when drafting an IEP. Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 53 (2005); see also Winkelman ex rel. Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 530 (2007) ("The IEP proceedings entitle parents to participate not only in the implementation of IDEA's procedures but also in the substantive formulation of their child's educational program."). Indeed, the IDEA explicitly requires school districts, among other things, to include the parents in the team that drafts the IEP, to consider "the concerns of the parents for enhancing the education of their child," and to address "information about the child provided to, or by, the parents." 20 U.S.C. § 1414 (d)(1)(B)(i), (d)(3)(A)(ii), (d)(4)(A)(ii)(III). Consequently, when a school district predetermines the educational program to be provided to a disabled student, including the student's placement, prior to meeting with the parents and closes its mind to the concerns or evidence of the parents, the IEP is procedurally flawed and must be set aside because the parents were deprived of any meaningful "opportunity to participate in the formulation process." Lathrop, 611 F.3d at 424 (internal quotation marks omitted); see also Deal v. Hamilton Cnty. Bd. of Educ., 392 F.3d 840, 857 (6th Cir. 2004) (collecting predetermination cases).

In this case, the district court made an express finding that the School District was willing to listen to the Sims's evidence and concerns and work with them when drafting all of B.S.'s IEPs, including the June 13, 2006 IEP. The district court further found that the School District provided all material information to the Sims regarding B.S. The district court's factual findings are not clearly erroneous because the record contains substantial support for each finding. For example, the record reveals that the School District consistently considered the Sims's outside medical evidence, ordered further testing based upon that evidence, and drafted each of the IEPs to reflect and at least partially incorporate the evidence and the Sims's concerns. Accordingly, we can find no procedural error with the June 13, 2006 IEP.[6]

III.

For the foregoing reasons, we affirm the judgment of the district court in all respects.

_____

[6]To the extent that the Sims are challenging the April 2, 2007 IEP as procedurally flawed due to the School District predetermining the services for and placement of B.S., the claim fails on the same grounds.