# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 99-3807

_____

| | | |
|---|---|---|
| Alan Gill, parent of Matthew Gill, a minor; Deborah Gill, parent of Matthew Gill, a minor, | * * * * | |
| Appellants, | * * | |
| | * * * * | Appeal from the United States District Court for the Western District of Missouri. |
| v. | * | |
| Columbia 93 School District; Missouri Department of Elementary and Secondary Education, | * * * * * | |
| Appellees. | * | |

_____

Submitted: April 10, 2000

Filed: July 10, 2000

_____

Before WOLLMAN, Chief Judge, MURPHY, Circuit Judge, and GOLDBERG[1], Judge.

_____

MURPHY, Circuit Judge.

_____

[1]The Honorable Richard W. Goldberg, Judge of the United States Court of International Trade, sitting by designation.

The parents of Matthew Gill, a child with autism, brought this action against Columbia 93 School District (District) and the Missouri Department of Elementary and Secondary Education (Department) under the Individuals with Disabilities Act, 20 U.S.C. §§ 1400 et seq. (IDEA), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (§ 504), and state law to challenge Matthew's education program. The district court[2] granted summary judgment to the District and dismissed the claims brought against the Department. The Gills appeal, and we affirm.

## I.

Matthew was born in Montana in October, 1992, fifteen weeks prematurely. He weighed less than two pounds at birth, and it became apparent over time that his development was impaired. After moving to Columbia, Missouri in the fall of 1994, the Gills enrolled Matthew in a Department program for young disabled children and their families. The program provided services such as speech and physical therapy and family counseling, and on the recommendation of a physician the Gills took Matthew for psychological evaluation in the spring and summer of 1995. Although specialists were reluctant to diagnose such a young child, they suggested that his impairments were consistent with a type of autism. They recommended that he be enrolled in an early education program for disabled children.

In the fall of 1995, shortly before Matthew's third birthday, a team including his parents, a teacher, and school therapists tailored a course of education for him. This course was summarized in a document called an individualized education program (IEP) which noted his developmental disabilities and offered him three half days of school each week and specialized therapy. The thirteen-page IEP set out a number of developmental goals and informed the Gills of their rights under IDEA. The Gills

---

[2]The Honorable William A. Knox, United States Magistrate Judge for the Western District of Missouri, presiding with consent of the parties.

accepted the program, and Matthew began at Parkade Elementary School in a "self-contained classroom" where disabled children are taught primarily by a single teacher. In addition to the ordinary instruction, Matthew was given physical, occupational, and speech therapy. Matthew was initially uncomfortable interacting with fellow students, but his social anxiety diminished over the course of the school year. By the end of his summer program, Matthew had made progress toward several of the goals in his IEP.

In August 1996, Matthew was formally diagnosed with autism. The Gills claim to have communicated the diagnosis to Matthew's IEP team in September 1996, the month in which the team met to review his performance under the prior year's plan and to discuss goals for the new school year. The team revised Matthew's developmental goals and concluded that he was prepared to benefit from more time in school. It also recommended to the Gills that Matthew receive a more definitive psychological assessment in order to assist the ongoing efforts to develop an appropriate program. The Gills accepted these revisions. These changes were incorporated into the IEP governing Matthew's program, and Matthew began to receive three and a half additional hours in a classroom each week, as well as more speech, occupational, and physical therapy.

The Gills began to investigate alternative methods of instruction for autistic children during the fall of 1996, and they came to believe that Matthew should primarily be educated in a system of one-on-one training known as the Lovaas method. In early 1997 they hired private Lovaas therapists who began to instruct Matthew at home. His private therapy increased to thirty-five hours a week, and the Gills reduced his school attendance to two half days per week. Although the record indicates that Matthew's verbal skills improved during the spring of 1997, it also shows that his social skills began to decline.

In February 1997, the Gills asked the District to schedule a mid-year meeting to reexamine Matthew's education, to modify his school program, and to fund his private

therapy program. The Gills believed that the course of instruction offered by the school was inadequate and asserted that Matthew required approximately forty hours of Lovaas therapy each week. They acknowledged that his home therapy would not teach him appropriate social interaction, but believed that a small amount of time in the classroom coupled with various private social interactions would take care of this aspect of his education.

The District Director of Special Education met with the Gills and Matthew's school teachers and therapists and also consulted with an expert on autism. At a March 21, 1997 meeting of the IEP team, the district director rejected the Gills' application for funding of Matthew's private program, but offered to make substantial modifications to his IEP immediately. She proposed increasing Matthew's time in the self-contained classroom to twelve hours each week and adding seventeen hours in a "reverse mainstream" classroom, in which non-disabled students are mixed in with disabled students. She also offered more one-on-one training in school and proposed hiring an additional aide for the classroom. These proposals were summarized in a new IEP which was dated March 21, 1997. Although the program did not satisfy the Gills, they agreed to implement the proposed services during those days when Matthew would attend school.

The IEP team continued to meet over the next ten months to work on Matthew's education plan, but the team members were unable to come to a consensus. The Gills persisted in asserting that Matthew should be instructed using the Lovaas method, but there is no evidence that they invited a Lovaas expert to participate in any of the meetings. The District believed that the home based program proposed by the Gills was not appropriate, in part because it would not allow Matthew to interact with non-disabled peers, and his IEP was substantially unchanged from March 21, 1997 until the end of the 1998-1999 school year.

In December 1997, while the IEP meetings were still ongoing, the Gills made a formal IDEA complaint to the Department. See 34 C.F.R. § 300.507(a)(1). They alleged that the education program offered by the District in the March 21, 1997 IEP was not appropriate for Matthew. The Department convened an administrative hearing which took place over eight days in February, May, and June, 1998.

Two of the three administrative panel members were experts on special education; the chair was a lawyer who had led such panels previously. See Mo.Rev.Stat. § 162.961(3). The witnesses included the Gills, as well as Matthew's teachers and therapists, and the Lovaas expert who had developed his private home program. There was much testimony about the methods used to educate Matthew in school and at home, the underlying pedagogical theories, and his performance under the respective programs. The Gills unsuccessfully sought to call two additional expert witnesses they had hired sometime after the March 21, 1997 IEP meeting. These experts had not participated in Matthew's program of therapy or the IEP discussions, but the Gills wished to call them to offer opinions concerning his education and the Lovaas method. They would have testified that in their view even after the March 21 modifications, the IEP offered by the District was not appropriate for Matthew and that he would have derived more benefit from the alternative program. The panel excluded their testimony on the basis that it was not relevant to the appropriateness of the March 21 IEP because it had not been brought up at that meeting. The Gills' offer of proof was put into the record,[3] one of their experts was permitted to testify about an article he had co-authored, and new expert testimony offered by the District was also excluded.

After receiving and evaluating all the evidence, the administrative panel found that the IEP offered by the District from March 21, 1997 until the end of the 1997-1998

---

[3]The Gills' offer of proof filled sixty transcript pages and described in detail what the recently retained experts would have said if permitted to testify.

school year had been appropriate for Matthew. It also found that the document outlining the plan should be rewritten to incorporate additional one-on-one therapy which the District had agreed to provide. Two of the three panel members voted for funding ten hours of weekly one-on-one training at home.

The Gills appealed the administrative decision in the federal district court. Their amended complaint challenged the appropriateness of the March 21, 1997 IEP which the administrative panel had reviewed. They also attacked the 1998-1999 program even though it was not the subject of the administrative proceeding, arguing that it was substantially similar to the March 1997 plan. The Gills argued that the District had improperly evaluated Matthew's disability, had failed to consult with autism experts, and had not fully notified them of their rights to be heard at IEP meetings. The Gills claimed that because the District had refused to provide Matthew with Lovaas method education, it had fallen short of its obligation to provide him with a free appropriate public education. The Gills also alleged that the Department had fallen short of its obligations under IDEA by failing to implement a system which would identify children with autism and ensure that they received appropriate early intervention. The Gills also complained about the exclusion by the administrative panel of some of their expert testimony and claimed that the Department was involved in denying Matthew a free appropriate public education. The District moved for summary judgment, and the Department moved to be dismissed from the case.

After reviewing the record of the administrative proceeding and hearing oral argument from the parties, the district court declined to expand the record to include the proposed expert testimony. It reasoned that Matthew's educational program as modified on March 21 could not be judged in hindsight and that the proposed evidence was cumulative. The court found that the programs offered to Matthew between March 21, 1997 and the end of the 1998-1999 school year were sufficiently similar that they could be considered together and that they were appropriate for him. It held that the

Gills were not entitled to public funding for Matthew's private program. Summary judgment was awarded to the District, and the Department was dismissed on the basis that the Gills' would have no viable claims against it if Matthew's public program was in fact appropriate.

At the heart of the Gills' appeal is their contention that the District and the Department did not meet their legal obligation to provide Matthew with a free appropriate public education and that IDEA gave them the right to supplement the administrative record with expert testimony.

## II.

IDEA requires states to provide a disabled student with a free appropriate public education. See Yankton Sch. Dist. v. Schramm, 93 F.3d 1369, 1373 (8th Cir. 1996). Section 504 of the Rehabilitation Act requires the same. 29 U.S.C. § 794(a), 34 C.F.R. § 104.33. One of the Congressional policies behind IDEA is to enable disabled children to be educated alongside their non-disabled peers rather than to be shut off from them, 20 U.S.C. § 1400, and disabled students are to be educated in a mainstream classroom whenever possible. Board of Educ. v. Rowley, 458 U.S. 176, 202 (1982); Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 612 (8th Cir. 1997). A specialized course of instruction must be developed for each disabled student, taking into account that child's capabilities. 20 U.S.C. § 1414(d)(1)(A). The services that a school district will provide to a child are to be summarized in a written statement called an individualized education program or IEP. Id.

IDEA includes an elaborate set of procedures intended to ensure parents' participation in the ongoing development of their child's educational program. Sch. Comm. of the Town of Burlington v. Dept. of Educ. of Mass., 471 U.S. 359, 368 (1985). If a child requires special education, a school district must convene a team to

formulate an IEP in light of the child's abilities and parental views about the child's education. 34 C.F.R. §§ 300.343(b)(2), 300.346(a)(1). The parents, the child's teacher, and a school official knowledgeable about special education must be included on the team which devises and reviews the IEP, and parents are free to invite other individuals with expertise to participate. Burlington at 368; Doe by Gonzales v. Maher, 793 F.2d 1470, 1489 (9th Cir. 1985); 34 C.F.R. § 300.344. The IEP must be reviewed at least once a year, and it should be periodically revised in response to information provided by the parents and to ongoing evaluations of the child's progress. Id. at § 300.343(c)(2).

Throughout this process parents must be notified of their procedural rights under IDEA, which include the right to an administrative hearing to evaluate the IEP team's decisions and the right to seek review by a federal court. 20 U.S.C. §§ 1415(d)(2), 1415(f), 1415(i)(2). School districts and state education departments may be held liable for failing to meet their obligation under IDEA. Id. at §§ 1415(a), (i)(2)(a). Although parents may assert their child's IDEA interests, the claim must relate to that particular student's rights under the federal statute. See Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); see also Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (courts cannot adjudicate policy questions where no individual rights would be vindicated).

Under Missouri law, an administrative panel reviewing the results of an IEP meeting must be made up of three individuals with expertise or training in special education. Mo. Rev. Stat. § 162.961. The Missouri scheme permits the parents to select one member of the panel, the school district to select another, and the state education department to appoint an attorney to serve as the chairperson. Id.; Blackmon, 198 F.3d at 654. At the administrative hearing, parents may bring counsel and special education experts and may present evidence and examine and confront witnesses. 20 U.S.C. § 1415(h).

The standard to judge whether an IEP is appropriate under IDEA is whether it offers instruction and supportive services reasonably calculated to provide some educational benefit to the student for whom it is designed. See Rowley, 458 U.S. at 201; Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 658-59 (8th Cir. 1999). The federal statute does not mandate that special education "maximize the capabilities" of disabled children, but states are free to establish a program with such a standard if they wish. Rowley, 458 U.S. at 198. If state legislation implementing IDEA creates a higher standard than the federal minimum, an individual may bring an action under the federal statute seeking to enforce the state standard. See Blackmon, 198 F.3d at 658-59. Whether an IEP is reasonably calculated to provide some educational benefit is a mixed question of law and fact and our review is de novo, Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 611 (8th Cir. 1997), cert. denied, 118 S. Ct. 1840 (1998), although the district court's findings of fact are binding unless clearly erroneous. Yankton Sch. Dist. 93 F.3d at 1374.

Congress used its spending power to set the requirements in IDEA. Rowley, 458 U.S. at 180. The federal statutory scheme creates an elaborate system by which states can receive federal special education funds if they provide disabled students with some educational benefit. Rowley, 458 U.S. at 180-81. See also Pennhurst State Sch. v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (congressional authority under the Spending Clause dependent on a state's knowingly accepting the statutory obligation). If a state legislature chooses to require more for its program, the state standard must be met in order to obtain federal special education funds. Id.

The Gills argue that Missouri has enacted a higher standard for the education of disabled children and that it requires a program designed to maximize the capabilities of the child. They point to the "Statement of Policy" in the Missouri special education statute, which talks about educational services "sufficient to meet the needs and maximize the capabilities" of disabled children. Mo. Rev. Stat. § 162.670. The body of the statute uses similar language to define "special education services," id. §

162.675(4), and "handicapped children" are defined as children who "require special educational services in order to develop to their maximum capacity." Id. § 162.675(2).[4]

Our court has previously applied the federal standard when evaluating a special education program in Missouri. See Clynes, 119 F.3d at 612-13. The Gills argue that Clynes should not control because it did not discuss all the points of state law they cite. The application of the federal standard in Clynes was part of the court's holding rather than dicta, however, and in our circuit only the court en banc can overrule a precedent. Goff v. Burton, 7 F.3d 734, 738 (8th Cir.1993).

Moreover, Missouri has not expressed an intent to override the federal standard. Missouri's special education statute took effect in 1973, some two years before the passage of the predecessor to IDEA. The Missouri legislature could not have anticipated in 1973 the terms of the subsequent federal statute, so it could not have intended to bind itself to a higher standard than one only later enacted by Congress. The Missouri legislature has not subsequently sought to impose a higher standard through statutory amendments, and the state regulations governing special education do not recognize a greater obligation than that found in the federal statute. Although Missouri courts have used the term "maximize the capabilities" of the child in dicta, no case has held that the legislature intended to require a higher standard of special education than the federal minimum. See Fort Zumwalt Sch. Dist. v. Missouri, 896

---

[4]The Gills also note that the 1980 version of the state regulations governing special education included the comment that, "[a]s stated within Section 162.670, RSMo., the provision of special education and related services is to maximize the capabilities of the handicapped student." Fiscal Year 1980 Annual Program Plan Amendment for Part B of the Education of the Handicapped Act at p.15c (emphasis in original). They do not claim, however, that the emphasized language was included in the state plan effective during the period Matthew's education program was formulated or reviewed. See Guardians Assoc. v. Civil Service Com., 463 U.S. 582, 596, 103 S. Ct. 3221, 77 L.Ed.2d 866 (1983).

-10-

S.W.2d 918, 920 (Mo. 1995); Mallory v. Drake, 616 S.W.2d 124, 125 (Mo.Ct.App. 1981). See also Lett v. City of St. Louis, 948 S.W.2d 614, 619 (Mo.Ct.App. 1996) (a later specialized statute will prevail over an earlier generalized statute). Because Missouri has not shown that it intended to employ a higher standard than that required by IDEA, the test here is whether Matthew's individualized program was sufficient to provide him with some educational benefit.[5]

The Gills complain that the District did not meet its obligations under IDEA because it did not offer Matthew the proper type of instruction. They believe that Matthew is entitled to receive approximately forty hours per week of one-on-one instruction in the Lovaas method and that they are entitled to reimbursement for expenses they have already incurred to give Matthew this type of instruction. They urge us to remand so that their proposed expert testimony may be considered since IDEA provides that a district court "shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(B)(ii).

Courts lack the specialized knowledge and expertise necessary to resolve persistent and difficult questions of educational policy. See Rowley, 458 U.S. at 208. Congress therefore created a comprehensive scheme which enables parents to present their views and those of experts throughout the cooperative formulation and review of a child's education plan by parents, teachers, and experts in special education. Competing opinions and parental preferences should be considered during the formulation of an IEP and its evaluation by an administrative panel, but a court should not intervene in these questions of education policy so long as it finds that a school

_____

[5]This conclusion is consistent with the Sixth Circuit's analysis in Doe v. Board of Educ. of Tullahoma City Schs., 9 F.3d 455 (6th Cir. 1993). In that case the Sixth Circuit concluded that the Tennessee legislature could not have intended that special education must meet a higher state standard when its law had been passed before Congress acted. Id. at 457. Although subsequent state legislative or judicial action could have mandated application of the higher state standard, neither had occurred. Id.

-11-

district has offered a program of specialized services reasonably calculated to enable a child to receive educational benefit. See id. at 206-07. Parents are not entitled to reimbursement for the cost of providing a private education to a disabled student unless the school district has not offered a free appropriate public education and the private placement is appropriate. See Clynes, 119 F.3d at 611-12; see also 20 U.S.C. § 1412(a)(10)(C)(i). Parents who unilaterally decide to spend money on private education do so at the risk that they will not receive reimbursement for the cost. See Clynes, 119 F.3d at 611-12; see also 20 U.S.C. § 1412(a)(10)(C)(i).

A federal court should give "due weight" to administrative proceedings and should not substitute its own notion of educational policy for that of the administrative panel. Rowley, 458 U.S. at 206. This means that a court should ordinarily defer to the administrative panel's judgment in building the record, but it is within its discretion to hear other evidence if a party provides "some solid justification" for expanding the record. See E.S. v. Independent Sch. Dist., No 196, 135 F.3d 566, 569 (8th Cir. 1998); Independent Sch. Dist. No. 283 v. S.D. by J.D., 88 F.3d 556, 560 (8th Cir. 1996). Our review is for abuse of discretion. See id. at 561.

The record before the district court contained evidence of Matthew's performance in school and at home. The administrative hearing stretched over eight days. The hearing transcript exceeded two thousand pages, and it included testimony concerning Matthew's performance at school and at home by the Gills and by teachers and therapists who had worked with him before March 21, 1997. Witnesses testified at length about the various types of instruction which had been proposed for Matthew, discussing their appropriateness for children with autism generally and for Matthew in particular. All witnesses were subject to cross-examination and to questioning by panel members. In addition, the district court reviewed a detailed medical diagnosis of Matthew, the results of diagnostic tests performed by private psychologists and by the District's psychological examiner, and the annual IEP evaluation reports concerning Matthew's progress in school.

The district court made extensive factual findings based on the evidence presented to the state hearing panel. The court found that Matthew had made progress under the program provided in 1995 and that the District made substantial alterations to his program under the guidance of an autism expert after it had been informed of his diagnosis. The court also found that one-on-one instruction had proven effective with Matthew and that the modified IEP offered many hours per week of such therapy. Matthew only attended school a few days each week after March 1997, but he benefited from this school based instruction. Although his verbal skills appeared to improve more quickly under his private therapy, his social skills suffered, perhaps as a result of his reduced school attendance. The court noted that the administrative panel had weighed the conflicting opinions of education experts who had worked with Matthew in concluding that the program he had been offered was appropriate for him. The court acknowledged that the competing methods of instruction might impart different skills, but declined to decide which of these skills should be emphasized, deferring to the expertise of the administrative panel. We cannot say that the district court abused its discretion when it concluded that the record was sufficient to evaluate the programs at issue.[6]

Children with autism have difficulty in developing cognitive, linguistic, and social skills. Although early diagnosis and therapy improve the outlook for such children, autism experts have a variety of opinions about which type of program is best.

[6]While IDEA plaintiffs are ordinarily required to exhaust administrative remedies before seeking judicial review, see Blackmon, 198 F.3d at 655, plans substantially similar to the IEP under review may also be considered. See Devries v. Spillane, 853 F2d 264, 267 (4th Cir. 1988), Johnson v. Lancaster-Lebanon Intermediate Unit 13, 757 F. Supp. 606, 614 n.6 (E.D. Pa. 1991). See also Rowley, 458 U.S. at 186-87 n. 9 (reviewing court may evaluate IEPs not yet formulated). No party here suggests that the public programs proposed after the March 21, 1997 IEP are not virtually identical to it, or that the court erred in evaluating the program offered to Matthew for the 1998-1999 school year.

Federal courts must defer to the judgment of education experts who craft and review a child's IEP so long as the child receives some educational benefit and is educated alongside his non-disabled classmates to the maximum extent possible. Here, Matthew's program was modified in response to the Gills' requests to provide more one-on-one therapy, but the District believed that the proposed private program would deprive him of social interaction necessary for his intellectual development. Parents who believe that their child would benefit from a particular type of therapy are entitled to present their views at meetings of their child's IEP team, to bring along experts in support, and to seek administrative review. The statute set up this interactive process for the child's benefit, but it does not empower parents to make unilateral decisions about programs the public funds. Since Matthew received a free appropriate public education, the Gills have not made out a claim against the District or the Department. See Warth, 422 U.S. at 499. Neither the administrative panel nor the district court erred in denying relief to the Gills.

## III.

The record indicates that the content of the March 21, 1997 IEP would have allowed Matthew to develop verbal, cognitive, and social skills. Because Matthew would have derived educational benefit from the programs offered by the District on and after March 21, 1997, we conclude that the District and the Department met their obligations under the applicable law. The Gills are therefore not entitled to public reimbursement for expenses they incurred in the private education program they developed for Matthew. Accordingly, we affirm the judgment.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.