**Dennis LAGARES, Sherry Lagares, and Dennis Lagares, Jr., a minor, by and through Dennis and Sherry Lagares, his parents and next friends, Appellant,**

v.

**CAMDENTON R–III SCHOOL DISTRICT, Respondent.**

**No. WD 59162.**

Missouri Court of Appeals, Western District.

Dec. 18, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 29, 2002.

Application for Transfer Denied March 19, 2002.

Michael H. Finkelstein, Jefferson City, for appellants.

James G. Thomeczek, for respondent.

Before SPINDEN, P.J./C.J., BRECKENRIDGE and NEWTON, JJ.

PATRICIA BRECKENRIDGE, Judge.

Dennis Lagares and Sherry Lagares, individually and as next friends for their minor son, Dennis Lagares, Jr., (Dennis), appeal the circuit court's judgment affirming the decision of a three-member due process hearing panel of the state board of education. The panel determined that Camdenton R–III School District (District) had provided Dennis a free appropriate public education as required by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C § 1400 *et seq.*[1] On appeal, the Lagareses claim that the panel erred in finding that a free appropriate public education had been provided to Dennis because the panel failed to apply Missouri's standard for making that determination, and instead applied a lower federal standard. Second, the Lagareses argue that even if the lower federal standard applied, the panel's finding that the District provided Dennis a free appropriate public education under that standard was against the weight of the evidence, because the education provided was "trivial and *de minimis* and did not provide him with an educational benefit." Because this court finds that the panel utilized the incorrect standard in deciding whether the District provided Dennis a free appropriate public education, the judgment of the circuit court affirming the panel's decision is reversed, and the cause is remanded.

## Factual and Procedural Background

Dennis was born on October 31, 1985. He began attending school in the Camdenton R–III School District in 1991, when he started kindergarten. Dennis achieved satisfactory grades on the majority of his reading and math skills tested in kindergarten, and a standardized test Dennis took that year showed that his reading achievement was better than 89 percent of the national norm. After the first half of Dennis' first-grade year, however, Dennis' teacher reported that he was below his grade level in reading. Nevertheless, Dennis' report card at the end of his first-grade year indicated at least average achievement in all of his subjects except spelling and math, and Dennis was passed to the second grade.

In the second grade, Dennis was placed in Chapter I, a special reading program. Dennis' report card that year indicated at least average achievement in all of his subjects, and Dennis was passed to the third grade. Dennis remained in the Chapter I reading program in third grade. Dennis' third-grade report card indicated that he was at least progressing, if not meeting expectations, in all of his subjects, and he was passed on to the fourth grade.

Before the start of Dennis' fourth-grade year, Ms. Lagares met with the principal of Dennis' school, Richard Hodits. Ms. Lagares expressed concern to Mr. Hodits over low scores Dennis received in several areas on the Missouri Mastery and

---

1. The IDEA was amended in 1997. The events giving rise to this lawsuit occurred prior to the amendment, so this court refers to the pre–1997 version of the IDEA.

Achievement Test (MMAT), a standardized test Dennis took at the end of his second-and third-grade years. On the second-grade MMAT, Dennis received a low rating in the areas of reading, language arts, and interpretation and problem solving, and a medium rating in the area of numerical concepts. On the third-grade MMAT, Dennis received a medium rating only in the area of geometry and measurement, and a low rating in the remaining areas of reading, language arts, numerical concepts, and interpretation and problem solving. Mr. Hodits suggested that Dennis remain in the special reading program.

Instead of keeping Dennis in the special reading program, Ms. Lagares had a licensed psychologist, Jeanette A. Williams, Ph.D., evaluate Dennis to assess the educational problems he had been having, particularly with reading. Dr. Williams administered one test that measured Dennis' intellectual functioning. Dennis' scores on that test indicated that Dennis' intellectual functioning was within the average range. The other test Dr. Williams gave Dennis measured his reading skills. On that test, Dennis' scores indicated that his reading skills were over one grade level behind the average of others in his grade.

After receiving Dr. Williams' assessment, Ms. Lagares requested that the District evaluate Dennis. The District determined, and Ms. Lagares agreed, that Dennis needed to be evaluated in his social, emotional, and behavioral development, and in his academic performance. The District evaluated Dennis, and on November 13, 1995, concluded that Dennis had a learning disability in the areas of basic reading skills and written expression.

After Dennis was identified as having a learning disability, the District formulated an Individual Education Program (IEP) outlining modifications to be made to Dennis' education to improve his basic reading and written expression skills. The IEP detailed objectives for Dennis, and dates on which Dennis would be evaluated to determine if he was meeting those objectives. The IEP noted that the best placement for Dennis was to spend the majority of time in the regular education classroom, with supplementary services to aid him in the regular classroom. Dennis was also to have one-on-one time every day with a special education teacher.

The District and the Lagareses reviewed Dennis' IEP in January 1996, and again in March 1996. In April 1996, the Lagareses notified the District that they intended to place Dennis in a summer school program at Churchill School, a private school in St. Louis for the learning disabled. The Lagareses requested that the District reimburse them for Dennis' tuition for summer school at Churchill. After another IEP review meeting in May 1996, the District offered Dennis summer school through its Summer Academy program. The Lagareses sent Dennis to summer school at Churchill.

During the summer, the District notified the Lagareses that it wished to have Dennis reevaluated by an independent agency in all areas of concern. The Lagareses rejected the reevaluation, and instead demanded that Dennis' teachers at Churchill provide an evaluation to the District.

At the beginning of Dennis' fifth-grade year in September 1996, the District modified Dennis' IEP to incorporate many of Churchill's recommendations. In preparation for another IEP review meeting in October 1996, Ms. Lagares sent a letter containing 28 specific directives she desired to have included in the IEP. Prior to the October 1996 IEP review meeting, however, the Lagareses withdrew Dennis from the District. When the Lagareses withdrew Dennis, he was achieving passing

grades. The Lagareses home schooled Dennis for the remainder of his fifth-grade year.

On November 6, 1997, the Lagareses requested a due process hearing pursuant to § 162.961, RSMo Cum.Supp.1997. Section 162.961, RSMo Cum.Supp.1997, allows a parent to "request a due process hearing by the state board of education with respect to any matter relating to identification, evaluation, educational placement, or the provision of a free appropriate public education of the child." One of the bases upon which the Lagareses requested the due process hearing was that the District had failed to provide a free appropriate public education for Dennis. Specifically, the Lagareses asserted:

> [T]he District has failed to provide an appropriate educational program to [Dennis] including a course of systematic, direct, multisensory instruction daily by an instructor trained in that method in order to educate [Dennis] in the sound structure of the American English language. In so doing the District ignored or disregarded expert professional advice regarding teaching methods and adjustments to [Dennis'] educational program.

The due process hearing was held in the summer of 1998. Following the hearing, the panel issued its findings of fact and conclusions of law on August 14, 1998. In its findings of fact, the panel reviewed Dennis' educational history, beginning with first grade. The panel concluded that Dennis is a child with a disability under the IDEA, in that he has "a specific learning disability in basic reading skill and written expression," and that his disability also "comports with the specific learning disabilities delineated in Missouri law." Because of his disability, Dennis is entitled to a free appropriate public education pursuant to 20 U.S.C. § 1400(c). The panel

noted that 20 U.S.C. § 1401(a)(18) defines a free appropriate public education as special education and services that "(1) are provided under public supervision and at public expense without cost to parents; (2) meet the standards of the state educational agency; (3) include an appropriate preschool, elementary, or secondary school education; and (4) are provided in conformity with the individualized education program required by § 1414(a)(5) of the act."

Relying on *Foley v. Special School District*, 927 F.Supp. 1214 (E.D.Mo.1996), the panel stated that the requirement of a free appropriate public education is met "when the school district provides personalized instruction with sufficient support services to enable the disabled child to benefit educationally from the instruction." The panel noted that "[t]he IDEA does not require that the educational program maximize a student's potential or provide the best education possible," and that "[t]he results need not be superior." The panel declined to consider whether the Missouri standard for determining whether a free appropriate public education has been provided is higher than the federal standard, or even whether the Missouri standard applies, because the Lagareses raised these arguments for the first time in their post-hearing brief.

Applying the federal standard, the panel stated that the individual education program that the District had developed for Dennis was "carefully tailored to [Dennis'] specific needs, substantively adequate, and reasonably calculated to enable him to benefit educationally." Therefore, the panel concluded that the District had provided Dennis with a free appropriate public education. Because the District had provided Dennis with a free appropriate public education, the panel denied Ms. Lagares' claim for reimbursement for the

expenses she incurred in placing Dennis in the summer program at Churchill School.

Following the panel's decision, the Lagareses filed a petition in the circuit court. In their petition, the Lagareses asked the circuit court to set aside the panel's order and find that the District denied Dennis a free appropriate public education and, thus, violated the IDEA. Specifically, the Lagareses alleged, *inter alia*, that the panel's decision was unauthorized by law because the panel applied the wrong standard to determine whether the District provided a free appropriate public education to Dennis. The Lagareses claimed that the panel should have applied the standard set forth in § 162.670, RSMo 2000,[2] which states that it is the policy of the State of Missouri to require public schools to provide "special educational services sufficient to meet the needs and maximize the capabilities of handicapped and severely handicapped children." The Lagareses also requested that the court award them attorney's fees and costs under the IDEA.

After reviewing the record before the panel and the parties' briefs, and after hearing oral argument, the court determined that the panel correctly utilized the federal standard, and not a higher maximizing standard, to find that the District provided Dennis with a free appropriate public education. Therefore, the court affirmed the panel's decision and denied the Lagareses' claims. The Lagareses filed this appeal.

### The Panel Applied the Incorrect Standard

In their first point, the Lagareses argue that the panel erred in determining that

the District provided a free appropriate public education to Dennis in compliance with the IDEA and Missouri law because the panel failed to apply the correct standard for making such a determination. The IDEA grants federal funds to "states that adopt policies and programs to assure 'all children with disabilities the right to a free appropriate public education.' " *Fort Zumwalt Sch. Dist. v. State*, 896 S.W.2d 918, 920 (Mo. banc 1995) (quoting 20 U.S.C. § 1412(1) (Supp.1991)). The IDEA's definition of a "free appropriate public education" is contained in 20 U.S.C. § 1401(a)(18), which provides:

(18) The term "free appropriate public education" means special education and related services that—

(A) have been provided at public expense, under public supervision and direction, and without charge,

(B) meet the standards of the State educational agency,

(C) include an appropriate preschool, elementary, or secondary school education in the State involved, and

(D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

In *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the United States Supreme Court set forth the minimum standard a state must meet to comply with the IDEA's requirement of providing a free appropriate public education to disabled or handicapped children.[3] In setting this standard, the Court

---

**2.** All statutory references are to the Revised Statutes of Missouri 2000, unless otherwise indicated.

**3.** The Court in *Rowley* was actually interpreting the provisions of 20 U.S.C. § 1401 *et seq.* when it was known as the Education for All Handicapped Children Act (EHA). The EHA, which was originally enacted in 1975, was

examined Congress' purpose for the Act, which was "to provide a 'basic floor of opportunity' consistent with equal protection[.]" *Id.* at 200, 102 S.Ct. at 3047. Consistent with this purpose, the Court determined that "the 'basic floor of opportunity' the Act provides consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201, 102 S.Ct. at 3048.

Because Congress' intent was merely to provide handicapped children with a "basic floor of opportunity" or equal access to education, the Court rejected the assertion that the Act required states to furnish special educational services necessary to maximize each handicapped child's potential. *Id.* at 198, 102 S.Ct. at 3046–47. The Court stated that "Congress' desire to provide specialized educational services, even in furtherance of 'equality,' cannot be read as imposing any particular substantive educational standard upon the States." *Id.* at 200, 102 S.Ct. at 3048. Instead, "Congress sought primarily to identify and evaluate handicapped children, and to provide them with access to a free public education." *Id.*

The Court concluded that a state satisfies the free appropriate public education requirement if it provides "personalized instruction with sufficient support services to permit the child to benefit educationally

from that instruction." *Id.* at 203, 102 S.Ct. at 3049. This instruction and services, however, "must be provided at public expense, *must meet the State's educational standards*, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP." *Id.* (emphasis added).

■■■ Because the IDEA requires that a state's special educational services meet the state's educational standards in addition to the Act's standard, several courts have concluded that the Act incorporates by reference state standards that exceed the minimum standard set by the IDEA and articulated in *Rowley. See Johnson v. Indep. Sch. Dist. No. 4 of Bixby*, 921 F.2d 1022, 1029 (10th Cir.1990); *David D. v. Dartmouth Sch. Comm.*, 775 F.2d 411, 419–20 (1st Cir.1985); *Nelson v. Southfield Pub. Sch.*, 148 Mich.App. 389, 384 N.W.2d 423, 425 (1986). Thus, while the IDEA sets forth the minimum standard a state's program must meet, "[i]f a state legislature chooses to require more for its program, the state standard must be met in order to obtain federal special education funds." *Gill v. Columbia 93 School Dist.*, 217 F.3d 1027, 1035 (8th Cir.2000).[4]

Missouri receives federal special education funds through the IDEA, and the statutes setting forth this state's special education policy and program are found in §§ 162.670 to 162.995. *Fort Zumwalt*, 896

replaced by the IDEA in 1990. The requirement of states implementing policies that assure the right to a free appropriate public education contained in 20 U.S.C. § 1412(1) of the IDEA, and the definition of a free appropriate public education contained in 20 U.S.C. § 1401(a)(18) of the IDEA remain unchanged from the versions contained in the EHA.

4. The panel declined to consider whether Missouri's standard for providing a free appropriate public education was higher than the fed-

eral standard, or even whether the Missouri standard applied, on the basis that the Lagareses raised these issues for the first time in their post-hearing brief. Since the IDEA mandates that a state's special educational services meet the state's educational standards in addition to the Act's standard, however, the panel was required to apply the Missouri standard in determining whether the District provided Dennis a free appropriate public education, without regard to whether the Lagareses raised the issue.

S.W.2d at 920. Section 162.670 declares the state's policy regarding the education of handicapped children:

> [I]t is hereby declared the policy of the state of Missouri to provide or to require public schools to provide to all handicapped and severely handicapped children within the ages prescribed herein, as an integral part of Missouri's system of gratuitous education, special educational services sufficient to meet the needs and *maximize the capabilities of* handicapped and severely handicapped children.

(Emphasis added.) Despite the statute's pronouncement that the state's policy is to provide special educational services that "maximize the capabilities of" handicapped children, the District argues that the legislature did not intend to set a higher state standard for special educational services than the IDEA's minimum standard. The Lagareses, however, contend that the statutes evidence that the legislature did, in fact, intend to require that special educational services in Missouri do more than merely "permit the child to benefit educationally." *Rowley*, 458 U.S. at 203, 102 S.Ct. at 3049.

■ To determine the intent of the legislature from statutory language, this court considers "the words used in their plain and ordinary meaning." *Butler v. Mitchell–Hugeback, Inc.*, 895 S.W.2d 15, 19 (Mo. banc 1995). Only when language is ambiguous, or when it leads to an illogical result, may courts look past the plain and ordinary meaning of a statute. *State ex rel. Md. Heights Fire Prot. Dist. v. Campbell*, 736 S.W.2d 383, 387 (Mo. banc 1987). The plain and ordinary meaning is generally derived from the dictionary. *Akers v. Warson Garden Apartments*, 961 S.W.2d 50, 53 (Mo. banc 1998).

■ The dictionary definition of the term "maximize" is "to increase to the highest degree[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1396 (1971). The dictionary definition of the term "benefit" is "to be useful or profitable to: AID, ADVANCE, IMPROVE[.]" *Id.* at 204. Applying the dictionary definitions of these terms to the articulated standards, Missouri's policy is to provide special educational services sufficient to meet the needs and increase to the highest degree the capabilities of handicapped children. In contrast, the standard set by the IDEA is that the special educational services be useful to, or aid, advance, or improve handicapped children. Considering the plain meaning of the terms "maximize" and "benefit," Missouri's maximizing standard for determining the sufficiency of special educational services for disabled or handicapped children is higher than the educationally benefit standard set by the IDEA. *See Nelson*, 384 N.W.2d at 425 (stating that Michigan's standard requiring that special educational services be designed "to develop the maximum potential of every handicapped person" is "more rigorous" than the minimum standard set by the predecessor to the IDEA).

■ The maximizing standard is stated in other statutory provisions besides § 162.670. Statutory provisions relating to the same subject matter are considered *in pari materia*, and are to be interpreted together. *EBG Health Care III, Inc. v. Mo. Health Facilities Review Comm.*, 12 S.W.3d 354, 360 (Mo.App.2000). This court presumes that statutes *in pari materia* are intended to be read consistently and harmoniously. *Id.* "It is presumed that the legislature intended that every word, clause, sentence, and provision of a statute have effect. Conversely, it will be presumed that the legislature did not insert idle verbiage or superfluous language in a statute." *Hyde Park Hous. P'ship v.*

*Dir. of Revenue,* 850 S.W.2d 82, 84 (Mo. banc 1993).

Section 162.675(2) defines "handicapped children" as children under twenty-one years old "who have not completed an approved high school program and who, because of mental, physical, emotional or learning problems, *require special educational services in order to develop to their maximum capacity.*" (Emphasis added.) Section 162.675(4) defines "special educational services," in part, as "programs designed to meet the needs and *maximize the capabilities of* handicapped or severely handicapped children...." (Emphasis added.) That the legislature specifically defines handicapped children as children who require special educational services to develop to their maximum capacity, and special educational services as those designed to maximize handicapped children's capabilities, is further evidence of the legislature's intent to require that special educational services in Missouri maximize the capabilities of handicapped children, rather than merely educationally benefit the children.

The District argues, however, that §§ 162.670 and 162.675 do not establish the state's standard for determining the sufficiency of special educational services. The District argues that, instead, the legislature delegated the power to establish such a standard to the state board of education. To support this claim, the District cites subdivisions (1), (2), and (3) of § 162.685, which provide:

The state board of education shall adopt, after at least one public hearing has been held by the commissioner of education on each subsection of this section and upon his recommendation and, after consulting with recognized authorities in the field:

(1) Standards to be used throughout the state of Missouri in determining whether children shall be defined under sections 162.670 to 162.995 as "handicapped children" or "severely handicapped children", together with regulations implementing these standards;

(2) Regulations governing evaluation and reevaluation of handicapped and severely handicapped children prior to and during assignment in a special educational program; provided, however, each child assigned to a special educational program shall be fully reevaluated on a regular basis;

(3) Standards for approval of all special education programs established under the provisions of sections 162.670 to 162.995 including, but not limited to, the qualifications of professional personnel employed in such programs and the standards to be used in determining the assignment of each child requiring special educational services to the program which best suits the needs of the child[.]

These statutory provisions empower the state board of education to promulgate (1) regulations concerning the standard for identifying handicapped children under the definitions contained in §§ 162.670 to 162.995; (2) regulations governing the evaluation and reevaluation of handicapped children before and during assignment in a special education program; and (3) standards for approving all special education programs established under §§ 162.670 to 162.995, including the qualifications of personnel and the standards for determining the assignment of the children to particular programs. None of the regulations the state board of education is empowered to adopt, however, concern the standard to be used in evaluating the sufficiency of the special educational services provided to a particular handicapped child.

Moreover, an administrative agency's authority is limited to that granted by

statute, and any regulation promulgated must be within the authority of statute. *Pen–Yan Inv., Inc. v. Boyd Kansas City, Inc.,* 952 S.W.2d 299, 303–04 (Mo.App. 1997). Indeed, in § 162.685(1) and (3), the legislature states that the standards and regulations authorized by those subdivisions are to be made pursuant to §§ 162.670 to 162.995. Thus, contrary to the District's assertion, § 162.685(1), (2), and (3) do not empower the state board of education to promulgate regulations and standards that conflict with or modify the maximizing standard set forth in §§ 162.670 and 162.675.

Finally, the District argues that a finding that the General Assembly intended to hold special educational services in Missouri to the higher maximizing standard is contrary to the Eighth's Circuit's interpretation of Missouri law. The primary case on which the District relies to support its position is *Gill v. Columbia 93 School District,* 217 F.3d 1027 (8th Cir.2000). In *Gill,* the parents of an autistic child argued, as do the Lagareses in this case, that Missouri has a higher standard that must be applied in determining whether the school district had provided a free appropriate public education to their child under the IDEA. *Id.* at 1035. The Eighth Circuit acknowledged that "[t]he federal statute does not mandate that special education 'maximize the capabilities' of disabled children, but states are free to establish a program with such a standard if they wish." *Id.* Further, if a state chooses to establish a program with this standard, this higher standard must be met to comply with the IDEA. *Id.*

The court in *Gill* then cited the maximizing language contained in §§ 162.670, and 162.675(2) and (4). Despite this language, however, the court decided that since a prior Eighth Circuit case had applied the "educationally benefit" standard in evaluating a special education program in Missouri, it was bound to follow that holding and apply the IDEA's minimum standard to the program at issue in *Gill. Id.* at 1036 (citing *Fort Zumwalt Sch. Dist. v. Clynes,* 119 F.3d 607 (8th Cir.1997), and stating that "in our circuit only the court en banc can overrule a precedent").

The Eighth Circuit further justified its determination that the federal standard, and not a higher maximizing standard, applies to the evaluation of special education programs in Missouri by stating:

> Missouri has not expressed an intent to override the federal standard. Missouri's special education statute took effect in 1973, some two years before the passage of the predecessor to IDEA. The Missouri legislature could not have anticipated in 1973 the terms of the subsequent federal statute, so it could not have intended to bind itself to a higher standard than one only later enacted by Congress. The Missouri legislature has not subsequently sought to impose a higher standard through statutory amendments, and the state regulations governing special education do not recognize a greater obligation than that found in the federal statute. Although Missouri courts have used the term "maximize the capabilities" of the child in dicta, no case has held that the legislature intended to require a higher standard of special education than the federal minimum.

*Id.*

As this court has already decided, however, the legislature expressed its intent to hold the special education programs to the maximizing standard when it enacted §§ 162.670 and 162.675(2) and (4). That these statutes were enacted prior to the passage of the predecessor to the IDEA and the articulation of the federal minimum standard in *Rowley* does not change

the plain meaning of the language in §§ 162.670 and 162.675(4) that special educational services in Missouri are "to meet the needs and maximize the capabilities of handicapped and severely handicapped children." Likewise, that the state standard is higher than later-enacted federal minimum standard does not make the state standard unenforceable under the IDEA. *See David D.,* 775 F.2d at 419 (stating that it did not "discern any intention that the [predecessor to the IDEA] preempt and reduce all state standards to the federal minimum"). Moreover, since the United States Supreme Court's articulation of the federal minimum standard in *Rowley* in 1982, the General Assembly has amended other provisions of the special educational services statutes, and could have amended the statutes to require that the services only "educational benefit" handicapped children, but instead, it has left the maximizing language contained in §§ 162.670 and 162.675(2) and (4) unchanged.

While federal cases interpreting Missouri law are persuasive, they "are not binding on this court interpreting our own state statute." *See Wentz v. Indus. Automation,* 847 S.W.2d 877, 880 n. 2 (Mo. App.1992). Unlike the Eighth Circuit in *Gill,* this court finds that the legislature's intent to hold Missouri special educational services to a higher standard than the IDEA's minimum "educationally benefit" standard is apparent from the plain language of the "maximize the capabilities" language used in §§ 162.670 and 162.675. "The legislature is presumed to have intended what the law states directly." *Metro Auto Auction v. Dir. of Revenue,* 707 S.W.2d 397, 404 (Mo. banc 1986).

Because Missouri's higher standard is incorporated into the definition of a free appropriate public education under 20 U.S.C. § 1401(a)(18), the panel erred in not determining whether the special educational services provided to Dennis were sufficient to meet his needs and maximize his capabilities. Since the panel incorrectly used only the federal minimum standard to determine that the District provided Dennis a free appropriate public education, this court does not need to address the sufficiency of the evidence to support that determination. Therefore, the judgment of the circuit court affirming the panel's decision is reversed, and the cause is remanded.

All concur.