# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 01-2889/2975

_____

Neosho R-V School District,     *

      Appellant/Cross-Appellee,    *

        *   Appeal from the United States

v.         *   District Court for the

        *   Western District of Missouri.

Kathy Clark, Garry Clark, as    *

parents of Robert Clark; Robert   *

Clark, a minor, by his next friends   *

Garry Clark & Kathy Clark, his   *

parents,        *

        *

      Appellees/Cross-Appellants.   *

        *

_____

Submitted: May 13, 2002
       Filed: January 15, 2003 (Corrected 01/23/2003)

_____

Before HANSEN, Chief Judge, MORRIS SHEPPARD ARNOLD, Circuit Judge, and
     PRATT,[1] District Judge.

_____

HANSEN, Circuit Judge.

_____

[1]The Honorable Robert W. Pratt, United States District Judge for the Southern District of Iowa, sitting by designation.

This dispute involves a disabled student's right to a free appropriate public education within the meaning of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1487 (Supp. III 1997).  The Neosho R-V School District (hereinafter "the School District") appeals the district court's[2] judgment that it failed to provide Robert Clark with a free appropriate public education and awarding attorneys' fees and costs to Robert Clark's parents (hereinafter "the Clarks").  The Clarks cross appeal the denial of their request for expert witness fees.  We affirm.

I.

Robert Clark was a twelve-year-old special education student in the Neosho R-V School District during the 1997-98 school year.  Because he suffers from Autism-Asperger's Syndrome, Robert is prone to inappropriate behavior, which, when unmanaged, largely prevents him from interacting with his peers in an acceptable manner.  He also is diagnosed as having a learning disability.  During the 1997-98 school year, Robert's age was equal to children in the sixth grade, but he was placed in the fifth grade resource room for special education.  His instructional level was that of fourth grade, but he needed assistance with this work, and the special education teacher often  moved him back to third-grade level work to decrease his misbehaviors and to increase his self-confidence.

Before the school year began, Robert's parents had initiated a due process proceeding against the School District, which resulted in a settlement agreement providing that the School District would place Robert in a self-contained classroom with mainstreaming in music.  The settlement agreement also provided for a full-time paraprofessional to help Robert in school and required the School District to provide specific interventions and strategies to manage Robert's inappropriate behavior.  In

_____

[2]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

August 1997, and again in October 1997, the School District developed Individualized Education Plans (IEPs) for Robert. Consistent with the settlement agreement, the IEPs placed Robert in a self-contained classroom except for music class, established an IEP team to meet every two weeks and consider the possibility of additional mainstreaming, and called for a full-time paraprofessional to accompany Robert in all classes. The IEPs also stated that a behavior plan was attached to them, but the attachments were merely short-term goals and objectives that did not provide specific interventions and strategies to manage Robert's behavior problems.

Robert's special education teacher, Mrs. Sweet, and his IEP-required paraprofessional, Larry Shadday, attempted to manage Robert's behavior problems to the best of their ability. They employed several methods that might be found in a behavior management plan but which had not been actually analyzed or approved by Robert's IEP team. They also used a checklist that had been included in a plan developed during the prior school year by an outside agency, the Judevine Center for Autism. The IEP team never adopted this document and had agreed that a new behavior management plan was necessary to meet Robert's needs during the 1997-98 school year. The IEP team agreed that the new plan should not be based on Robert's past behavior. Robert's special education teacher did not begin to formally chart data in a format that could be used to develop a new behavior management plan until March 1998.

As the 1997-98 school year progressed, Robert's behavior problems increased dramatically. His challenging behaviors numbered 3 in the month of August, 10 in the month of September, and 394 by March. The School District did not attempt to formulate a new behavior management plan for Robert until April 1998, close to the end of the school year. Robert's increasingly inappropriate behavior prevented him from being included in mainstreamed classes beyond music and substantially interfered with his ability to learn.

The Clarks sought an administrative hearing as provided by the IDEA. See 20 U.S.C. § 1415(f). Before the hearing, the Clarks were seeking, among other things, a private placement for Robert or a more inclusive placement within the district. By the time of the administrative hearing, the issues had been narrowed to the question of whether the School District had provided the required behavior management plan necessary to ensure that Robert received a free appropriate public education.

At the hearing, the Clarks presented the expert witness testimony of Dr. Lonny Morrow. In his opinion, Robert's autism and resulting challenging behavior required the adoption of a formal behavior management plan that would include a functional behavior assessment and develop consequences and reinforcements appropriate to Robert's disability. The three-member state administrative panel chose to credit this expert testimony. Based on this testimony, the panel found that although the IEPs identified some goals and strategies for dealing with Robert's behavior problems, these were insufficient to qualify as a cohesive behavior management plan. The panel also found that the School District's late-in-the-year attempt to formulate the required behavior management plan was insufficient to meet Robert's needs.

The School District contended that Robert's academic record demonstrated he had received some benefit from his education, even if the behavior plan did not meet the expert's requirements. The administrative panel did not credit that evidence, finding it contradicted by other evidence and unsupported by the record as a whole. The panel found that the conflicting evidence left it with no clear evidence from which it could determine if or to what extent Robert had progressed or obtained any educational benefit.

Thus, the administrative panel concluded that the School District failed to develop and implement the required behavior management plan calculated to meet Robert's needs and to enable him to gain an educational benefit. The panel ordered the School District to seek the expertise of a consultant or qualified expert to devise

4

a behavior management plan including (1) an ongoing functional behavior analysis to identify causative factors and objectionable behaviors, and (2) a list of replacement behaviors and strategies to eliminate Robert's objectionable behavior and enable him to receive educational benefits. The panel also ordered the School District to provide its staff with development training for working with students who have Asperger's Syndrome and high functioning autism.

The School District brought suit in federal district court, seeking judicial review of the administrative panel's decision. See 20 U.S.C. §1415(i)(2). On cross motions for summary judgment, the district court affirmed the panel decision that the School District had failed to provide Robert with a free appropriate public education. The district court concluded that the Clarks were prevailing parties and ordered the School District to pay attorneys' fees of $15,689.50. The district court denied the Clarks' request for expert witness fees. The School District now appeals, and the Clarks cross appeal the denial of their request for expert witness fees.

II.

A. Free Appropriate Public Education

One purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. §1400(d)(1)(A). States accepting federal funding under the IDEA must "provide a disabled student with a free appropriate public education." Gill v. Columbia 93 Sch. Dist., 217 F.3d 1027, 1034 (8th Cir. 2000); see also 20 U.S.C. § 1412(a). Congressional policies indicate a preference for educating disabled children in a mainstreamed classroom whenever possible. Gill, 217 F.3d at 1034; 20 U.S.C. § 1400(c)(5)(D). A team must develop a specialized course of instruction, known as

5

an individualized education program, or "IEP," for each disabled student, taking into account that child's capabilities. Gill, 217 F.3d at 1034; 20 U.S.C. § 1414(d).

In a suit by an aggrieved party under the IDEA, the court engages in a twofold inquiry, asking (1) "has the State complied with the procedures set forth in the Act?" and (2) is the IEP "reasonably calculated to enable the child to receive educational benefits?" Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982). "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." Id. at 207. While the IDEA requires school districts to provide disabled children with a free appropriate public education, it "does not require that a school either maximize a student's potential or provide the best possible education at public expense." Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 612 (8th Cir. 1997), cert. denied, 523 U.S. 1137 (1988). Instead, the requirements of the IDEA "are satisfied when a school district provides individualized education and services sufficient to provide disabled children with 'some educational benefit.'" Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 658 (8th Cir. 1999) (quoting Rowley, 458 U.S. at 200).

In this case, there is no contention that the school district failed to follow the procedures set forth in the IDEA. Rather, the dispute involves the second inquiry–whether the August and October 1997 IEPs were reasonably calculated to enable Robert to receive an educational benefit. The district court determined that because the IEPs required a behavior management plan and because the attachments to the IEPs did not qualify as such and no approved plan was timely developed, the IEPs were not reasonably calculated to provide an educational benefit.[3]

_____

[3]This case is slightly different in posture from others we have seen because it involves a failure to implement a necessary provision of an otherwise appropriate IEP. See Houston Ind. Sch. Dist. v. Bobby R., 200 F.3d 341, 349 (5th Cir. 2000) (setting forth the analysis that a party who is challenging the implementation of an IEP must demonstrate that the school authorities failed to implement a substantial or

6

The School District asserts that, contrary to the district court's ultimate conclusion, Robert's IEPs were reasonably calculated to provide Robert an educational benefit. Specifically, the School District asserts (1) that the district court erred in giving deference to administrative panel findings of no educational benefit because those findings were contradicted by the evidence, (2) that the IEPs appropriately addressed Robert's behavior problems, and (3) that the district court erred in concluding that the School District denied Robert a free appropriate public education.

We review de novo, as a mixed question of law and fact, the ultimate issue of whether an IEP is reasonably calculated to provide some educational benefit. Gill, 217 F.3d at 1035 (citing Fort Zumwalt, 119 F.3d at 611, and Yankton Sch. Dist. v. Schramm, 93 F.3d 1369, 1374 (8th Cir. 1996)). "[T]he district court's findings of fact are binding unless clearly erroneous." Id. The district court must receive the record of the state administrative proceedings and any additional evidence at the request of either party. 20 U.S.C. § 1415(i)(2)(B). Then, basing its decision on the preponderance of the evidence, the district court "shall grant such relief as the court determines is appropriate." Id. While courts are required to make an independent

_____

significant provision of the IEP; and noting that this analysis affords schools some flexibility in implementing IEPs but still holds them accountable for material failures and for providing a meaningful educational benefit), cert. denied, 531 U.S. 817 (2000). While the analysis set forth in Bobby R. more accurately suits the posture of this case, the parties did not make this argument. Thus, we confine our analysis to the framework of Rowley, which considers whether the IEP was reasonably calculated to provide an educational benefit. We believe that this analysis is pliable enough to fit the situation at hand and will safeguard the same principles because we cannot conclude that an IEP is reasonably calculated to provide a free appropriate public education if there is evidence that the school actually failed to implement an essential element of the IEP that was necessary for the child to receive an educational benefit.

7

decision based upon a preponderance of the evidence, the fact that the statute requires the reviewing court to receive the administrative records "carries with it the implied requirement that <u>due weight</u> shall be given to these proceedings." <u>Rowley</u>, 458 U.S. at 206 (emphasis added), <u>see also</u> <u>Fort Zumwalt</u>, 119 F.3d at 610. This ensures that courts will not "substitute their own notions of sound educational policy for those of the school authorities which they review." <u>Rowley</u>, 458 U.S. at 206. Thus, the statutory obligation to grant "such relief as the court determines is appropriate" largely references the statute's procedural obligations; it does not permit the court to exercise a free hand in imposing substantive educational standards. <u>Id.</u>

We have noted that the district court's standard of review under the IDEA is less deferential than the substantial evidence test ordinarily applied in federal administrative law cases. <u>Blackmon</u>, 198 F.3d at 654. At the same time, however, courts are admonished to be mindful that they lack the specialized knowledge and experience necessary to resolve difficult questions of educational policy. <u>Id.</u> at 654-55. Additionally, a district court should give consideration to "the fact that the state hearing panel has had the opportunity to observe the demeanor of the witnesses." <u>Fort Zumwalt</u>, 119 F.3d at 610.

In this case, the district court was careful not to substitute its own notions of educational policy for those of the trained educators, and we conclude that the district court gave due weight to the administrative hearing panel's findings that Robert did not receive an educational benefit. The parties presented no additional evidence to the district court, and the district court's written order evidences an independent review of the administrative hearing record. The district court concluded that the record supported the administrative panel's decision to discount the evidence of Robert's alleged academic progress, and it gave deference to the panel's determination that the materials attached to the IEPs did not constitute a proper behavior management plan. The district court stated that because those decisions were supported by evidence in the record, to do otherwise would be "to substitute its

views regarding proper educational methods and programs for the Panel's views on those topics." (Appellant's Add. at 6.) While the record is certainly not one-sided on the issue of whether Robert received an educational benefit, we agree that on the whole, the record supports the credibility assessments and findings made by the administrative panel and deferred to by the district court.

The School District's arguments that the IEPs appropriately addressed Robert's behavior problems and that the district court erred in concluding that the School District denied Robert a free appropriate public education are intertwined. Our independent review convinces us that because the IEPs did not appropriately address his behavior problem, Robert was denied a free appropriate public education.

The Clarks' expert witness testified that the papers attached to the IEPs were not sufficient to amount to a cohesive behavior management plan. Witnesses confirmed that such a plan was never adopted by the IEP team, in spite of the fact that Robert's behavior problem was the major concern at every IEP meeting. Although the special education teacher and the paraprofessional commendably attempted to cope with Robert's behavioral problems using methods that could have been employed in a behavior management plan, they were not professionally trained to successfully reduce the inappropriate behavior in a manner fitting to Robert's disabilities. The fact that no cohesive plan was in place to meet Robert's behavioral needs supports the ultimate conclusion that he was not able to obtain a benefit from his education.

Our review indicates that the administrative panel's decision reflects a thorough consideration of all the evidence regarding Robert's academic progress and his behavioral problems. The panel discounted the evidence of some slight academic progress, finding that this evidence of progress was contradicted by other evidence in the record. The record demonstrates that every time Robert's special education teacher advanced his work to a fifth-grade level, the stress engendered resulted in

behavior problems that forced the teacher to readjust his work back to fourth-grade levels (which he needed assistance to complete) and even to third-grade levels to afford Robert a measure of success.

The School District points to report cards which assertedly indicate a measure of success sufficient to be considered an educational benefit, regardless of whether the IEP stated a behavior management plan. The administrative panel reviewed all of this evidence in a detailed fashion and discounted it because the records did not indicate at which grade level Robert was working at any given time or over any period of time. The records also indicated that work at higher levels was only possible with a great deal of help from the paraprofessional.

The special education teacher stated generally that she thought Robert had attained some benefit academically, and her records indicated that some short-term objectives had been met. She admitted, however, that whenever she attempted to advance Robert's work, his behavior problems worsened and prevented independent success at any level beyond third grade. Robert's mother also stated generally that she thought Robert had made "some" progress during the 1997-98 school year. (Appellant's App. at 249.) She qualified her answer, clarifying that she sought more integration for him not because she felt Robert had progressed, but because she was certain that he could progress if given more mainstream classroom opportunities, which would only be possible with a proper behavior management plan.

Kerri Muns, the director of the Southwest Missouri Autism Project, was involved with the Judevine Center for Autism and had attended Robert's IEP meetings at the request of his parents. She testified that Robert's behavior problems always precluded him from attending a regular classroom, which was the main goal of his IEPs. She opined that Robert had progressed "in a very broad sense" (id. at 180), noting that he now could start a conversation and look a person in the eye,

10

which he could not do at the beginning of the year. On the other hand, his short attention span had not increased.

The administrative panel concluded that the generalized opinions of progress expressed by some witnesses at the hearing were "meaningless" in light of all the other evidence in this case. (Appellant's Add. at 28.) Our review of the record convinces us that the panel did not err in discounting the evidence of de minimis academic and social progress where the panel pointed to specific evidence in the record contradicting such a benefit and noted that any slight benefit obtained was lost due to behavior problems that went unchecked and interfered with his ability to obtain a benefit from his education. The district court considered not only the administrative panel's conclusions, but also the hearing record to reach its own conclusion that "the need for–and the ability to create–a proper behavior modification plan existed long before [the School District] made the effort to [create a plan]." (Id. at 5.) Upon de novo review, we agree that the School District failed to provide Robert an educational benefit by not developing and implementing an appropriate behavior management plan as required by his IEPs.

## B. Attorney Fees

The IDEA provides that "the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party." 20 U.S.C. § 1415(i)(3)(B). "We review de novo the determination of prevailing party status." Birmingham v. Omaha Sch. Dist., 298 F.3d 731, 734 (8th Cir. 2002). "A litigant is a 'prevailing party' if he obtains 'actual relief on the merits of his claim that materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.'" Id. (quoting Farrar v. Hobby, 506 U.S. 103, 111- 12 (1992)) (alterations omitted).

11

The School District argues that the district court erred in determining that the Clarks were the prevailing parties and abused its discretion by awarding attorneys' fees that were not reasonable in light of the Clarks' limited success. The School District further asserts that even if this court affirms the conclusion that it did not provide Robert with a free appropriate public education, the fees and costs must be reduced. We respectfully disagree.

Even though the Clarks began the process seeking relief such as a private placement or an inclusive placement within the district, the record demonstrates that the only issue in dispute at the administrative hearing was whether the attachments to the IEPs satisfied the requirement of providing Robert with a proper behavior management plan. The Clarks prevailed on this issue. There is no assertion that the School District offered a behavior management plan by way of settlement, aside from the vague propositions already contained in the IEPs. When the administrative panel ordered the School District to consult an expert and devise a proper behavior management plan, it altered the legal relationship between the parties by granting Robert a legal right previously denied him by the School District's failure to devise and implement a behavior management plan. This amounts to actual relief on the merits of Robert's IDEA claim, and thus the district court properly determined that the Clarks were the prevailing parties and correctly granted an award of attorneys' fees.

We review the award of attorneys' fees for an abuse of discretion. Birmingham, 298 F.3d at 734. The district court awarded only 40% of the amount of attorneys' fees that the Clarks sought. According to the district court, this reduction properly reflected that much of the prehearing work was spent on issues that were not ultimately tried or prevailed upon in the administrative hearing. We find no abuse of discretion.

12

The School District argues that the Clarks unreasonably protracted the proceedings, and thus the fees should be further reduced. If parents "unreasonably protract[] the final resolution of the controversy," the court shall reduce the fee award accordingly. 20 U.S.C. § 1415(i)(3)(F). The School District asserts that the Clarks waited too long to narrow the issues to the one on which they prevailed and that they unreasonably refused a good faith offer to settle. The district court has already discounted the award of attorneys' fees for work on unsuccessful or abandoned claims, and the district court stated that "[t]here is no indication that Plaintiff ever offered the relief ultimately ordered by the hearing panel, much less any indication that Plaintiff made a written offer to settle that issue." (Appellant's Add. at 18.) For the same reason, the district court refused to deny attorneys' fees under 20 U.S.C. § 1415(i)(3)(D), which provides that attorneys' fees must be denied when a party refuses a settlement offer and the court finds that the offer of settlement was more favorable than the relief finally obtained. The court did not so find, and we see no abuse of discretion in that decision.

## C. Expert Witness Fees

The Clarks cross appeal, asserting that the district court abused its discretion in denying their request for expert witness fees as costs. Whether expert witness fees may be awarded as costs under the IDEA is an issue of first impression in this circuit. See Warner v. Indep. Sch. Dist. No. 625, 134 F.3d 1333, 1336 n.1 (8th Cir.) (noting the issue but concluding that we did not need to address the issue at that time given our disposition of that case), cert. denied, 525 U.S. 823 (1998). In fact, our research indicates that no circuit court has yet ruled on the issue. Among the district courts there is a split of authority on whether reasonable expert witness fees are payable under the IDEA. See BD v. DeBuono, 177 F. Supp. 2d 201, 207 (S.D.N.Y. 2001) (citing cases on both sides of the issue).

13

The statute at issue is labeled, "Award of Attorneys' Fees," and it provides that "the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party." 20 U.S.C. § 1415(i)(3)(B). This language "assumes, by its construction, that costs include something more than attorney's fees," but the IDEA does not specifically authorize an award of costs or define what items are recoverable as costs. Pazik v. Gateway Reg. Sch. Dist., 130 F. Supp. 2d 217, 220 (D. Mass. 2001). "Costs," however, is an ordinary term with which federal judges are well acquainted, and the necessary statutory authority to award them resides elsewhere in the Code. Absent a specific definition of costs, we look to the general provisions providing for the taxation of costs in federal courts as a matter of course. Title 28 U.S.C. § 1920(3) (2000) provides for payment of witness fees, and 28 U.S.C. §1821(b) (2000) limits that payment to a $40 per day attendance fee. The IDEA provides no explicit authority to exceed this amount for expert witnesses, and the Supreme Court has held that "absent explicit statutory or contractual authorization for the taxation of the expenses of a litigant's witness as costs, federal courts are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920." Crawford Fitting Co. v. J. T. Gibbons, Inc., 482 U.S. 437, 445 (1987) (emphasis added).

The dissent asserts that these general provisions governing costs in federal court do not apply here because § 1821 is limited in relevant part to the cost of "a witness in attendance at any court of the United States, or before a United States Magistrate." 28 U.S.C. § 1821(a) (emphasis added). Because the expert witness in this case appeared in the state due process hearing and not in federal court, the dissent says we should avoid the applicability of the provisions of the general cost statutes. While the emphasized language of § 1821 is undeniable, we conclude that it poses no impediment to the application of the statute to the present case. In our view, the specific language of the IDEA broadens the application of the general cost statutes by permitting the court to "award reasonable attorneys' fees as part of the costs" "in any action or proceeding brought under this section." 20 U.S.C. § 1415(i)(3)(B)

14

(emphasis added). Thus, it is our understanding that Congress's use of the undefined term "costs" points us to the general cost statutes and specifically broadens their applicability to all federal actions or state due process "proceedings" provided for in the IDEA.

The Clarks urge us to look to the legislative history, which they assert provides clear intent that Congress sought to include expert witness fees as costs under the IDEA. A House Conference report states as follows:

> The conferees intend that the term "attorneys' fees as part of the costs" include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the parent or guardian's case in the action or proceeding, as well as traditional costs incurred in the course of litigating a case.

H.R. Conf. Rep. No. 99-687, at 5 (1986), reprinted in 1986 U.S.C.C.A.N. 1807, 1808. In another context, Justice Scalia commented for the Court in a footnote on this particular bit of legislative history. He characterized it as "an apparent effort to depart from ordinary meaning and to define a term of art," and he also stated that "th[is] specification would have been quite unnecessary if the ordinary meaning of the term included those elements." West Virginia Univ. Hosps. v. Casey, 499 U.S. 83, 92 n.3 (1991), superseded by statute on other grounds, 42 U.S.C. § 1988(c) (1994). We conclude that this "apparent effort" to define a term of art in legislative history is an unsuccessful one. It is not the kind of "explicit statutory" authorization the Supreme Court said in Crawford was necessary to exceed the limitations of the general cost statutes.

Proper respect for the legislative powers vested in Congress "implies that statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the

15

legislative purpose." United States v. Albertini, 472 U.S. 675, 680 (1985) (internal quotations and alterations omitted). There is no doubt that Congress knows how to specify a shifting of expert witness fees. West Virginia Univ. Hosps, Inc. v. Casey, 499 U.S. 83, 88-89 (1991) (noting that "[a]t least 34 statutes in 10 different titles of the United States Code explicitly shift attorney's fees *and* expert witness fees"), superseded by statute, 42 U.S.C. § 1988(c) (1994) (providing explicitly for an award of expert witness fees). Yet, the fee shifting statute at issue here provides no explicit authorization of expert witness fees. "We must assume Congress understood the meaning of the words it incorporated into the Act." Welsh v. Boy Scouts of America, 993 F.2d 1267, 1270 (7th Cir.) (internal quotation and alteration omitted), cert. denied, 510 U.S. 1012 (1993). Nothing in the plain language of the statute indicates that the district court is authorized to exceed the limitations set out in § 1821 and § 1920.

Absent some ambiguity in the statute, we have no occasion to look to legislative history. The dissent would find ambiguity in the term "costs," but that general term is governed by the general cost statutes, and there is no contrary indication in the IDEA. "Unless exceptional circumstances dictate otherwise, when we find the terms of a statute unambiguous, judicial inquiry is complete." Burlington N. R.R. v. Okla. Tax Comm'n, 481 U.S. 454, 461 (1987) (internal quotations and alterations omitted). We refuse to accept legislative history alone as an acceptable exceptional circumstance. We are bound to follow circuit precedent, which states that "[t]he mere fact that statutory provisions conflict with language in the legislative history is not an exceptional circumstance permitting a court to apply the legislative history rather than the statute." United States v. Erkickson P'ship (In re Erickson P'ship), 856 F.2d 1068, 1070 (8th Cir. 1988). "We refuse to read into the statute what Congress has declined to include." Welsh, 993 F.2d at 1270. This is particularly true where the Court has specifically indicated that the term "costs" should be construed narrowly as not including expert witness fees. See Casey, 499 U.S. at 87 n.3 (relying on Crawford Fitting to reject a claim that the generic term "costs" might include

expert witness fees: "We are aware of no authority to support the counter-intuitive assertion that the term 'costs' has a different and broader meaning in fee-shifting statutes than it has in the costs statutes that apply to ordinary litigation." (internal quotation and alteration omitted)). In truth, it is the conferees' language which creates the asserted ambiguity, not the statute's use of the word "costs."

The observations of the Seventh Circuit are particularly relevant here:

> We as judges of the U.S. Court of Appeals have only the power to interpret the law; it is the duty of the legislative branch to make the law. We must refuse to infringe on the legislative prerogative of enacting statutes to implement public policy. The problems of public policy are for the legislature and our job is one of interpreting statutes, not redrafting them.

Welsh, 993 F.2d at 1270-71 (internal quotations and alterations omitted).

We thus conclude that the district court did not err in refusing to grant expert witness fees under the IDEA.

## III.

Accordingly, we affirm the judgment of the district court in all respects.

PRATT, District Judge, concurring in part and dissenting in part.

As the majority notes, one stated purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. §1400(d)(1)(A). For the most part, I believe the majority's

17

opinion commendably adheres to and supports this noble purpose. I agree that the School District's failure to develop and implement an appropriate behavior management plan for Robert precluded any educational benefit. I also agree that the district court did not abuse its discretion in awarding the Clarks a reasonable attorneys' fee. Most of all, I agree that the School District denied Robert Clark the free appropriate public education to which he was legally entitled. I do not, however, agree with the majority's refusal to award expert witness fees under the IDEA, and I believe that such a holding runs afoul of the law, congressional intent, public policy, and, most importantly, Robert Clark's right to a free appropriate public education designed to meet his unique needs. I, therefore, dissent from part II. C. of the majority's opinion.

A. Witness Fees, §1821, and the IDEA

In Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445 (1987), the Supreme Court held that "absent explicit statutory authority or contractual authorization for the taxation of the expenses of a litigant's witness as costs, federal courts are bound by the limitations set out in 28 U.S.C. §1821 and §1920." Because the IDEA's fee shifting provision, which allows for "attorneys' fees as part of the costs," does not explicitly mention expert witness fees, the majority concludes that the plain language of the statute indicates that the district court was bound by the limitations set out in §1821 and §1920. 20 U.S.C. §1415(i)(3)(b). In so doing, the majority discounts clear legislative history indicating that Congress intended the statute to allow for "reasonable expenses and fees of expert witnesses." H.R. Conf. Rep. No. 99-687, at 5 (1986), reprinted in 1986 U.S.C.C.A.N. 1807, 1808. Crediting Congress' ability to explicitly specify a shifting of expert witness fees, the majority posits that "absent some ambiguity in the statute, we have no occasion to look to legislative history." Maj. Op. At 16 (citations omitted). This analysis is flawed.

18

Quite simply, given the plain language of §1821, the statute can not apply in the present case; nor should it limit the award of expert witness fees in any IDEA case. Title 28 U.S.C. § 1821(a) states:

(1) Except as otherwise provided by law, a witness in attendance at any court of the United States, or before a United States Magistrate Judge, or before any person authorized to take his deposition pursuant to any rule or order of a court of the United States, shall be paid the fees and allowances provided by this section.

(2) As used in this section, the term "court of the United States" includes, in addition to the courts listed in section 451 of this title, any court created by Act of Congress in a territory which is invested with any jurisdiction of a district court of the United States.

By its terms, §1821 applies only to witnesses in attendance at any court of the United States, before a United States Magistrate, or a deposition taken under a court rule or order. In contrast, the IDEA's fee shifting provision grants the district court discretion to grant "attorneys' fees as part of the costs" in "any action or proceeding brought under this section." In fact, the district court in the present case awarded attorneys' fees as part of the costs, not for proceedings before any court of the United States, but for an administrative due process hearing before a state agency panel. The Clark's expert witness never appeared before the district court-or any court of the United States, and, therefore, cannot be bound by the $40 per diem rate in §1821(b).

Next, the nature of the IDEA and its associated due process hearings differs greatly from the federal antitrust and civil rights litigation at issue in Crawford Fitting Co. and West Virginia Univ. Hosps. v. Casey, 499 U.S. 83 (1991). Moreover, as a regulatory scheme, the IDEA is unlike any of the 34 statutes identified by Justice Scalia in Casey, wherein the statutory language provides for both attorneys' fees and expert witnesses as part of the costs. Id. at 89. In enacting the IDEA, Congress, by

19

virtue of its spending power[4], conditioned the allocation of federal funds on a state's passage of, and adherence to, the IDEA's procedural and substantive regulations. See 20 U.S.C. §1411 (Authorization; allotment; use of funds; authorization of appropriations), §1412 (State eligibility). To ensure that disabled children received the free appropriate education to which they were entitled, Congress mandated that states enacting the IDEA establish an administrative due process proceeding presided over by a state's executive education agency. 20 U.S.C. §1415(a), (f).

The IDEA state due process hearings occur neither before a court of the United States, nor before a court created by an act of Congress. Rather, Congress reserved judicial review and allocation of costs to the district courts of the United States. 20 U.S.C. § 1415(i)(3)(A) and (B). In so doing, Congress places the district court in the unfamiliar role of a reviewing court whereby the district court is expected to give due weight to the findings of the state administrative hearing panel. Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982). The district court must then base an award of costs on a review of the state hearing panel proceedings. Included in this award are witness fees for expert witnesses whom the parties have a stated right to have present at the state hearing, but who are contemplated neither in the plain language of §1821, nor in the statutes cited or otherwise at issue in Crawford Fitting Co. or Casey.

Of course, citing differences between the IDEA and other statutes that do contain explicit expert witness fee shifting provisions does little to compel such an award in the present case. As Justice Scalia suggested in Casey "in our view this

---

[4]Had Congress simply mandated that state governments pass the IDEA regulations, or enacted the IDEA as a federal scheme with directives to state agency officials, the Act would likely be an unconstitutional encroachment on state sovereignty. See New York v. U.S., 505 U.S. 144 (1992) (holding that Congress may not direct a state to enact or enforce a particular law or type of law); Printz v. U.S., 512 U.S. 898 (1997) (Congress may not commandeer the executive branch of a state government and compel it to do even ministerial tasks).

undercuts rather than supports [the] position." Casey, 499 U.S. at 91, n.5. In referring to the same House conference report discounted by the present majority, Justice Scalia noted "the statement is an apparent effort to *depart* from ordinary meaning and to define a term of art." Id. (emphasis in original). As the state hearing panel proceedings from which the district court must award fees depart from the ordinary meaning of federal litigation, Congress had occasion to define a term of art. The IDEA's clear legislative history provides the intended definition:

> The conferees intend that the term 'attorneys' fees as part of the costs' include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the parent or guardian's case in the action or proceeding, as well as traditional costs incurred in the course of litigating a case.

H.R. Conf. Rep. No. 99-687, at 5 (1986), reprinted in 1986 U.S.C.C.A.N. 1807, 1808. Given the nature of the state due process hearings mandated by the IDEA, the district courts are wise to turn to the statute's legislative history for guidance when awarding reasonable attorneys' fees as part of the costs.

## B. The IDEA's Policy Mandate

Beyond Congress's clear legislative intent, the nature and purpose of the IDEA compels an award of expert witness fees as part of the costs. In amending the IDEA to its current form, Congress found that:

> (2) Before the date of the enactment of the Education for All Handicapped Children Act of 1975 (Public Law 94-142) [enacted Nov. 29, 1975]--
> (A) the special educational needs of children with disabilities were not being fully met;

(3) Since the enactment and implementation of the Education for All Handicapped Children Act of 1975 [enacted Nov. 29, 1975], this Act [20 USCS §§ 1400 et seq.] has been successful in ensuring children with disabilities and the families of such children access to a free appropriate public education and in improving educational results for children with disabilities.

(4) However, the implementation of this Act [20 USCS §§ 1400 et seq.] has been impeded by low expectations, and an insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities.

20 U.S.C. §1400(c).

In response to noted challenges in implementing the previous Education for All Handicapped Children Act of 1975, Congress passed the IDEA to ensure:

(1) (A) that all children with disabilities have available to them a free appropriate public education . . . designed to meet their unique needs...; (B) that the rights of children with disabilities and parents of such children are protected; and
(3) that educators and parents have the necessary tools to improve educational results for children with disabilities by supporting systemic-change activities; coordinated research and personnel preparation; coordinated technical assistance, dissemination, and support; and technology development and media services;

20 U.S.C. §1400 (d).

The majority's conclusion that the prevailing parents of a disabled child are not entitled to recover fees for expert witnesses under the IDEA subverts the very purposes for which the statute was enacted. Parents prevailing in an IDEA action receive no compensatory or punitive damages. Thompson v. Board of the Special Sch. Dist. No. 1, 144 F.3d 574, 580 (8th Cir. 1998) (quoting Heidemann v. Rother,

22

84 F.3d 1021, 1033 (8th Cir. 1996)). Rather, the purpose of an IDEA due process action is to ensure that the rights of disabled children and their parents are protected, and that the disabled child receives the free appropriate public education to which he or she is entitled. To enforce these rights, however, the disabled child and his or her parents must square off against the child's own school and its resources.

School districts, thankfully, employ many education and child experts. Schools turn to these in house experts in developing special education programs for disabled students. In working with parents to ensure that their child is receiving an appropriate education, the school district and its experts are certainly not immune to disagreement. In such a case, the IDEA guarantees the parents the right to bring the matter before a state administrative hearing panel. The IDEA mandates that all parties be accorded "the right to be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities." 20 U.S.C. §1415(h)(1). As one might expect, school districts again look to their in house experts to testify on behalf of the school district's position. And, although parents are afforded the right to counsel, attorneys are not equipped to advocate the specifics of what constitutes a free appropriate public education designed to meet the unique needs of the disabled student. If, however, parents can recover only their attorneys' fees, those parents who lack the resources to hire an expert witness to evaluate and testify on behalf of their child are left with nothing but their attorney to protect their rights. The testimony of the school district's expert, therefore, goes unchallenged. As the present case illustrates, the school district's position is not always correct. Accordingly, expert witness testimony on both sides plays an integral part in IDEA due process hearings. To deny a prevailing parent the right to recover the fees paid to an expert witness forecloses the likelihood that many underprivileged children will receive the free appropriate public education to which they are entitled. Such an action diminishes rather than protects the rights of disabled children.

## C. The Need for Expert Witnesses

The present case demonstrates the imperative need for disabled children and their parents to be able to enlist the support of expert witnesses when seeking to enforce the child's rights under the IDEA. Here, the School District left the task of ensuring that Robert Clark received an appropriate education with its Director of Special Services, Michael Bilderback. Bilderback served as the School District's representative in the Clarks' first settlement agreement. He presided over all of Robert's IEP meetings, and oversaw the implementation-or lack thereof-of the IEPs. When disputes arose between the School District and the Clarks, Bilderback again served as the District's representative. As the District representative at the state due process hearing, Bilderback testified as the District's expert witness, and vigorously defended the District's efforts to provide Robert with a free appropriate public education. While one might argue the desirability of such an acute involvement, the reality of the situation is deeply troubling.

During the school year leading to the state due process hearing, the Clarks relationship with Mr. Bilderback devolved into a power struggle focused not on the needs of Robert Clark, but simply on winning. The district court's opinion reflects this attitude, noting "the Court's decision in this regard is guided, to a certain extent, by its puzzlement over the litigious nature of this proceeding." (Appellant's Add. at 10). For the parties involved, the power struggle between the Clarks and the School District, via Mr. Bilderback, became a severe obstacle to any progress on Robert's behalf. In February, 1998, both Kerri Muns, Program Director for the Judevine Autism Project, and Cecilia Callahan, Director of Advocacy for the Missouri Protection and Advocacy Services, wrote to Mr. Bilderback and asked him to remove himself from Robert Clark's IEP team. (Appellant's App. at 1151, 1163). In her letter, Ms. Muns stated: "I feel there is a power struggle going on between yourself and the Clark family. We have met continuously for a year now and still have gotten nowhere when it comes to diagnosis and inclusion." (Id. at 1151). At the state due

process proceedings, Victoria Atkinson, an area supervisor with the Missouri Department of Education, Division of Special Education, testified that her dealings with Mr. Bilderback, regarding Robert Clark or any child, were marked by indifference, false assurances, and frustration. (Id. at 267-269). Ms. Atkinson further testified that, unlike with any other director of special services, she immediately notified her supervisor after any dealings with Mr. Bilderback, because a number of complaints had been issued against the Neosho School District. In concluding her testimony, the Missouri Department of Education area supervisor simply stated, "Mr. Bilderback was a jerk." (Id. at 273).

Regardless of the many requests for Mr. Bilderback to remove himself from the process, he remained on as the school district's representative. In fact, the problems between the Clarks and Mr. Bilderback were so severe that the Clarks expressed concern about whether Robert could return to the District without incurring great animosity.[5] When the Clarks had their opportunity to argue before the state due process panel, they once again found themselves in a battle with Michael Bilderback as the School District's representative and quasi-expert witness. In his testimony, Bilderback argued that the school district had met and exceeded the requirements of the IDEA; that Robert Clark had received an educational benefit; and that Robert Clark had received a free appropriate public education. Absent the presence of Dr. Morrow, the Clarks' expert witness, Mr. Bilderback would have been the lone expert testifying on the adequacy of the School District's efforts.

---

[5]The state hearing panel apparently agreed with the Clarks. In light of the fact that Mr. Bilderback testified that he would not be returning to the District, the panel found "that there is no animosity towards Petitioner among those members of the Respondent's staff who will be employed during the next school year." (Appellant's Add. at 29).

As it was, the Clarks were fortunate enough to have Dr. Morrow testify on Robert's behalf. The state hearing panel chose to credit Dr. Morrow's testimony over that of Mr. Bilderback's, and the state hearing panel, the district court, and now this Court all concluded that the School District failed to provide Robert with a free appropriate education. In reaching its conclusion, the state panel found that Mr. Bilderback "made little or no attempt to put together a behavior management plan", and that "he showed little leadership in addressing the behavior problems of the Petitioner." (Appellant's Add. at 28). Furthermore, the state hearing panel relied heavily on Dr. Morrow's expert testimony in finding that the School District had no one on its staff with the expertise to adequately meet Robert's needs. Restated, because of Dr. Morrow's testimony, the state hearing panel, the district court, and this Court concluded that the School District had failed to meet any of the IDEA's three stated goals. Yet, without the testimony of Dr. Morrow, the uncontested opinions of Mr. Bilderback could have carried the day. Such a scenario subverts the very purpose of the IDEA.

In defending the rights of their son, the Clarks did not have resources of a school district, staffed with a number of education and child experts. Nor were they represented by a large private law firm. No, the Clarks were simply parents who believed that their son's school district had denied him the free appropriate public education to which he was entitled. In their fight to protect their son's rights, they relied on the Missouri Protection and Advocacy Services, "a federally mandated system . . . which provides protection of the rights of persons with disabilities through [free] legally based advocacy." Missouri Protection and Advocacy Services Home Page, (visited Dec. 16, 2002) <http://members.sockets.net/~mopasjc/MOP&A.htm>. Thus, to ensure that their son received a free appropriate public education, the Clarks have relied on one publically funded organization to challenge the resources of the school district, another publically funded entity. Under the majority's holding, the Clarks, and any other parent in like circumstances, will still end up incurring significant debt to ensure that their child receives a free education. This assumes,

however, that the parents have the ability to hire an expert in the first place.  If not, the rights of the disabled child are left to the school district to decide.  This could not have been Congress's intent when it amended the IDEA to its present form.

### D.  Conclusion

The IDEA does not provide all parents with the opportunity to recover attorneys' fees as part of the costs.  It is only where the parents prevail after showing that their child's school failed-or is failing-to provide their disabled child with an educational benefit to which he or she is legally entitled that the parents can hope to recover the costs involved in enforcing their disabled child's rights.  The need for expert advocacy to protect the rights of the child is undeniable and undisputed.  The fundamental purposes of the IDEA are attainable only when disabled children can rely on the support of expert witness testimony in due process proceedings.  The law does not constrain the award of expert witness fees with the same per diem limitations as in ordinary litigation.  Rather, the ambiguous character of the IDEA's fee shifting provision compels reference to the Act's legislative history, wherein one finds a clear statement of congressional intent to include expert witness fees as part of the costs.

The IDEA does not limit its benefits to only those who can afford to recoup them.  Quite the contrary, the IDEA seeks to ensure that all disabled children, whether rich or poor, receive a free appropriate public education designed to meet their unique needs.  In deciding this question of whether parents who prevail in an action to enforce the rights of their child should be entitled to recover expert witness fees as part of their costs, we are called upon to uphold the rights of the disabled and the poor.  Because I believe the majority's decision today fails to adequately protect the right of all disabled children to a free appropriate public education,

I respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.